**Opinion issued November 18, 2014**



**In The**
**Court of Appeals**
**For The**
**First District of Texas**

————————————

**NO. 01-12-00578-CV**

———————————

**JIM P. BENGE, M.D., AND KELSEY-SEYBOLD MEDICAL GROUP,**
**PLLC, Appellants**
**V.**
**LAUREN WILLIAMS, Appellee**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-52657**

**O P I N I O N**

Dr. Jim Benge and his employer, Kelsey-Seybold Medical Group, PLLC,

appeal from an adverse jury verdict finding that Dr. Benge's medical negligence

caused a perforation of Lauren Williams's bowel during a hysterectomy. Dr. Benge

and Kelsey-Seybold (collectively Dr. Benge) raise three issues challenging the

judgment against them. First, Dr. Benge contends that Williams's expert on the

applicable medical standard of care was statutorily disqualified. Second, Dr. Benge

argues that the jury charge commingled in one broad-form submission two theories of negligence—negligent surgical technique and negligent failure to obtain the patient's informed consent—over his objection, resulting in harmful error. Third, Dr. Benge asserts that the trial court erred in refusing to allow periodic payment of future medical expenses.

We first consider whether the trial court abused its discretion in allowing Williams's expert on the standard of care to testify; we hold that it did not. We next consider whether the jury charge impermissibly combined valid and invalid theories of liability into a single liability question. Because we conclude that it did and that Dr. Benge preserved the error for appeal, we reverse and remand the cause for a new trial. As a result, we do not reach the issue of periodic payments.

**Background**

Williams brought this health care liability case following a hysterectomy. The hysterectomy was performed by Dr. Benge, a board-certified obstetrician and gynecologist who has practiced with Kelsey-Seybold since 2000. Dr. Benge was assisted by Dr. Lauren Giacobbe, a third-year obstetrical/gynecological resident in Methodist Willowbrook Hospital's four-year residency program. It is undisputed that Williams's bowel was perforated as a result of the hysterectomy.

## A. Williams's hysterectomy, complications, and subsequent surgeries

Dr. Benge first saw Williams, then age 39, in June 2008, two months before her surgery. Williams discussed her symptoms, including chronic and "excruciating" pain during her menstrual period. Dr. Benge diagnosed Williams with uterine fibroids, dysfunctional uterine bleeding, and pelvic pain. After consulting with Dr. Benge, Williams elected to undergo a laparoscopic-assisted vaginal hysterectomy (LAVH) to remove her uterus, ovaries, and fallopian tubes.

Dr. Benge next met with Williams one week before the LAVH surgery. Dr. Benge discussed the procedure and presented her with written disclosure and consent forms that they reviewed together. The consent forms—which tracked the requirements imposed by the Texas Legislature—set forth surgical risks associated with the LAVH procedure, including, among other things, damage to the bowel, the injury that formed the basis for Williams's claim. The consent forms also stated that Dr. Benge could use such "associates, technical assistants and other health care providers as [he] may deem necessary" during the surgery and that those assisting Dr. Benge may include "residents" who could "perform important tasks" during the surgery "under the supervision of a responsible physician." Dr. Benge testified that during this visit he told Williams that he "would be doing the surgery with an assistant." Williams disputes that contention. She testified that he did not tell her there would be an assistant. Although it is disputed whether Dr. Benge

3

mentioned using an assistant in the procedure, the parties agree that Dr. Benge did not tell Williams that he would be assisted by someone with no prior experience assisting on an LAVH procedure.

Williams signed the consent forms and agreed in writing to proceed with the planned LAVH surgery. Dr. Benge performed the LAVH procedure on the morning of August 26, 2008, with Dr. Giacobbe assisting. While Dr. Giacobbe had significant experience with hysterectomies and laparoscopic surgeries, she had not previously assisted an LAVH surgery. Dr. Giacobbe testified that she explained to Dr. Benge her experience level before the surgery began and that he determined the tasks she would perform. She also testified that she introduced herself to Williams on the morning of the surgery and told Williams that she was a resident and was going to be "assisting" Dr. Benge with the surgery. Dr. Giacobbe did not identify the surgical tasks she would perform; she testified that she did not know those details until after the surgery began. Williams disputed Dr. Giacobbe's testimony. She testified that she did not speak with Dr. Giacobbe on the morning of her surgery. Williams further testified that she would not have undergone the surgery if she had been informed that it was Dr. Giacobbe's first time assisting an LAVH surgery.

The amount of assistance provided by Dr. Giacobbe was disputed. An LAVH operation is divided into two parts: the laparoscopic part, followed by the

4

vaginal part. The post-operative report does not indicate which physician performed which portion of the procedure. Dr. Giacobbe testified that Dr. Benge remained at all times "in control of the patient's care and directing" the surgery. She estimated that she performed approximately 40% of the surgery and did so under Dr. Benge's direction and supervision. In a document she signed after the surgery that was maintained to monitor the resident's experiences, however, she reported that she was "the surgeon," which required her to perform 50% or more of the surgery. Dr. Benge estimated that Dr. Giacobbe performed 40% or less of the surgery. He testified that the standard of care is "for the attending physician to decide, based on [the resident's] skill-set, what is appropriate for her to do."

During the laparoscopic part of the LAVH, Dr. Benge stood on the right side of Williams while Dr. Giacobbe stood on the left. Dr. Benge demonstrated each step of the operation to Dr. Giacobbe and showed her "how to use the instruments and what to do." Dr. Giacobbe would then repeat the same thing on the left side— the side where Williams was determined to have a perforation—while Dr. Benge observed.

Upon completion of the procedure, Dr. Benge examined the surgical area but saw no signs that Williams's bowel had been perforated. He noted no complications in the post-operative report. Within hours of the surgery, Williams began to complain of severe pain, abdominal tenderness, and nausea. Later that

5

day, rectal bleeding was discovered. By the time Dr. Benge saw Williams on the morning following the LAVH procedure, she had a fever and was anemic, tachycardic, and in constant pain. According to Dr. Benge, nothing about Williams's condition at that time indicated that she had a perforated bowel. He started her on intravenous antibiotics and ordered an x-ray of her chest to ensure that she did not have pneumonia. He did not see her again that day because he went home ill; instead, Dr. Carmen Thornton took over Williams's care.

Williams's post-operative condition continued to deteriorate: her hemoglobin and hematocrit levels fell significantly, she required a multi-unit blood transfusion, and she experienced constant pain. Three days post-surgery, Dr. Thornton ordered a consultation from a gastroenterologist, who performed an emergency exploratory surgery that night and determined that Williams had an undiagnosed bowel perforation that was allowing feces from Williams's intestines to leak into her abdomen. The doctors repaired the perforation, but a colostomy was required.

Afterwards, she was moved to ICU and placed in a chemically-induced coma. Williams subsequently developed sepsis and underwent a tracheotomy. A mechanical ventilator was required. Williams remained comatose at the hospital for three weeks. She was discharged on October 1, 2008, and transferred to

Kindred Rehabilitation Hospital. When she left Kindred the next month, she required home health assistance and was unable to work.

Williams had a second surgery in May 2009 in an effort to reverse the colostomy. This procedure could not be completed successfully; therefore, the colostomy was replaced with an ileostomy. Three months later, Williams had her third post-LAVH surgery to replace the ileostomy with another colostomy; the surgery was successful, but the colostomy became permanent. Williams has had two additional surgeries since then to address complications related to the colostomy.

## B.    Possible causes of Williams's perforated bowel

One week after Williams's LAVH, Dr. Benge wrote an e-mail to Dr. Giacobbe stating his theory of how the bowel injury occurred. Specifically, he stated that the injury likely resulted from "an electrical arc from the BOVIE,[1] not a sponge stick or the weighted speculum."[2] According to Dr. Benge, during the vaginal portion of the surgery, the weighted speculum was touching the area where the bowel perforated. Dr. Benge opined that an arc of electricity went from the BOVIE through the weighted speculum, causing a "thermal injury" to Williams's

---

[1]    The "BOVIE" is an electrical cauterizing instrument that uses energy to cut the tissue or to fuse it together to stop bleeding.

[2]    A weighted speculum is a surgical tool used to hold tissue in an optimal location to allow the surgeon better access to the surgical area.

bowel tissue below. Even though no immediate damage to the bowel tissue was visible at the time of the surgery, Dr. Benge theorized at trial that an electrical arc from the BOVIE could have caused the inflammation, tissue breakdown, and bowel perforation Williams experienced. While neither Dr. Benge nor Dr. Giacobbe saw an electrical arc during the surgery, Dr. Benge testified that it is possible for an arc to pass from the BOVIE without being seen.

Dr. Bruce Patsner, a board-certified obstetrician/gynecologist, testified as Williams's medical liability expert. In his opinion, the perforation of Williams's bowel occurred during the vaginal portion of the LAVH procedure and was caused by a surgical cut, not a thermal injury resulting from an electrical arc as Dr. Benge opined. Dr. Patsner testified that, based on reasonable medical probability, it was more likely that the less-experienced resident made the surgical error, not Dr. Benge.

He opined that the "red flags" presented to Dr. Benge after the hysterectomy suggested operative complications that needed to be addressed. In Dr. Patsner's opinion, Dr. Benge should have suspected a bowel injury and requested an immediate general surgical consultation not later than the day after the surgery. Dr. Patsner opined that, had Dr. Benge done so, Williams "wouldn't have ended up in the operating room with . . . [a] septic shock catastrophe." Based on his opinion that Dr. Benge failed to thoroughly or timely investigate and evaluate the source of

Williams's post-LAVH complications, Dr. Patsner concluded that Dr. Benge deviated from the standard of care and proximately caused Williams's injuries.

The jury found in Williams's favor and awarded damages.

## Dr. Patsner Met Statutory Qualifications

In his first issue, Dr. Benge contends that the trial court erred by denying his motion to strike Dr. Patsner as an expert witness. During both the pre-trial and trial phases of this litigation, Dr. Benge challenged Dr. Patsner's qualifications under Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401–.403 (West 2011). Dr. Benge did not assert a substantive challenge to Dr. Patsner's qualifications; rather, he focused on the temporal requirements of the statute. Dr. Benge argued that Dr. Patsner was not "practicing medicine" at the requisite points in time during the litigation, as required by section 74.401(a)(1). TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(1) (providing that witness may qualify as expert in health care liability suit if witness "is a physician who . . . is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose."). His argument is based on Dr. Patsner's departure from the United States and subsequent work as a law professor and professor of medicine in Korea at the time of his testimony.

9

## A. Standards of review regarding statutory qualifications

Each party has the burden to prove that her own expert is qualified to offer expert testimony at trial. *Rittger v. Danos*, 332 S.W.3d 550, 558–59 (Tex. App.—Houston [1st Dist.] 2009, no pet.). The determination of whether a witness is qualified to testify as an expert is left largely to the trial court's discretion. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). We will not disturb the trial court's determination that an expert is qualified unless the trial court abuses its discretion. *See id.* A trial court abuses its discretion when it acts "'without reference to any guiding rules or principles.'" *Id.* (quoting *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995)); *see Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006). In close cases, we defer to the trial court's resolution of expert qualifications and will not reverse its judgment. *See Larson*, 197 S.W.3d at 304.

A challenge to an expert's qualifications that raises an issue of statutory construction involves a question of law that we review de novo. *Group v. Vicento*, 164 S.W.3d 724, 730 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). We strive to ascertain and give effect to legislative intent when interpreting statutes. *See id*. We look to the plain and common meaning of the language in the statute, reading the statute as a whole and not in isolation. *Id.* If the meaning is unambiguous, we interpret it according to its terms, giving it a meaning that is

consistent with other provisions in the statute. *Id.* Courts read every word as if it was deliberately chosen and presume that omitted words were excluded purposefully. *Id.* We may also consider the legislative objective as well as the consequences of any particular construction. *Id.*

Dr. Benge contends that Williams's expert, Dr. Patsner, does not meet the statutory qualifications to be a medical liability expert witness. We, therefore, review de novo the section 74.401 requirements applicable to expert medical testimony. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401.

## B.      Section 74.401(a) requires that Dr. Patsner was "practicing medicine"

Section 74.401(a) establishes a threefold hurdle that a witness must overcome to qualify as an expert with respect to medical standards of care. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a). The expert must: (1) be "practicing medicine" at the time the claim arose or at the time the testimony is given; (2) have knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) be qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *Id*. Dr. Benge challenges the first requirement, arguing that Dr. Patsner was not "practicing medicine" at the specified points in the litigation. Williams concedes that Dr. Patsner was not practicing medicine at the time her claim arose: he was a professor at the

11

University of Houston Law Center. Williams argues, instead, that Dr. Patsner's work at the time of his testimony meets the statutory requirements for "practicing medicine."

"Practicing medicine" is defined as follows:

> For the purposes of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(b).

Dr. Benge offers three arguments why Dr. Patsner's work at the time he testified does not meet the statutory requirement that he be "practicing medicine." First, he argues that Williams failed to establish that the Korean school of medicine with which Dr. Patsner was affiliated was "an accredited school of medicine" under section 74.401(b). Second, he argues that Williams offered no evidence that any of the Korean physicians with whom Dr. Patsner was consulting at the time of his testimony meets the statutory definition of a "physician" under section 74.401(g), which requires that the individual be licensed to practice medicine in a state within the United States or have graduated from a medical school with particular accreditations. *See* § 74.401(g).[3] Third, he argues that, to the extent the

---

[3]    In this subchapter, "physician" means a person who is:

    (1) licensed to practice medicine in one or more states in the United States; or

12

phrase "practicing medicine" is not limited to the two specifically enumerated definitions listed in section 74.401(b), the phrase nevertheless requires Dr. Patsner to have actually "examined [or] admitted" patients, and Williams offered no evidence that Dr. Patsner was examining or admitting patients in Korea or elsewhere at the relevant time.

We conclude that the statutory definition of "practicing medicine" provides a nonexclusive list of activities that qualify an expert to testify and further conclude that Dr. Patsner's work at the time of his testimony qualifies as "practicing medicine." To assist in explaining our holding, we turn first to Dr. Patsner's medical background.

### 1.    Dr. Patsner's medical background

Dr. Patsner's professional background includes private medical practice, teaching positions at medical schools and affiliated hospitals, government service, and teaching positions at law schools. He has worked both in the United States and abroad.

---

(2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship between the alleged departure from that standard of care and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. §  74.401(g) (West 2011).

13

Dr. Patsner is licensed to practice medicine in three states and is board-certified in obstetrics/gynecology with a sub-specialty certification in gynecological oncology. He graduated from Baylor College of Medicine in 1979. He completed his residency in obstetrics and gynecology at the Beth Israel Medical Center at Harvard Medical School. He also completed a fellowship in gynecological oncology in 1985 at the Roswell Park Memorial Institute.

After numerous years teaching at medical schools and working in private practice, Dr. Patsner attended law school. Afterwards, he was a senior medical officer at the Food and Drug Administration in Washington, D.C., for several years and served as the FDA's representative to the Gynecology Practice Committee of the American College of Obstetricians and Gynecologists.

In 2007, Dr. Patsner returned to Houston to teach at the University of Houston Law Center. He also began working as an Associate Professor and Director of Colposcopy and Preinvasive Disease in the Department of Obstetrics and Gynecology at Houston's Baylor College of Medicine. In connection with this position, he received a Temporary Faculty License which permitted him to practice at a limited location even though he did not have a state-wide Texas medical license. He saw patients at Baylor for approximately one and one-half years while also teaching medicine-related law classes at the University of Houston Law Center. At Baylor, he also taught medical students and residents in obstetrics and

14

gynecology and was directly involved in resident teaching conferences to discuss the best methods for performing gynecologic surgery. His affiliation with Baylor ended July 1, 2011.

Though the exact timing is unclear, Dr. Patsner testified that he also was the Assistant Director of Gynecology Oncology Service at Ben Taub Hospital and Harris County Hospital District until he "left Houston" in 2011 for Korea. In this position, he was responsible for teaching medical students and residents in obstetrics/gynecology and fellows in oncology at Ben Taub. He was one of three board-certified gynecological cancer surgeons; he selected and scheduled which of the three would perform various procedures, based on their comparative abilities. He also was one of four attending physicians running gynecological oncology clinics at Ben Taub, where he oversaw Ben Taub's "inpatient pre- and post-operative care of surgical patients on gynecological oncology . . . on an every-other-week basis." He ran four clinics a week, seeing patients with preinvasive disease, benign gynecological issues, and gynecological oncology problems.

Dr. Patsner has over 120 peer-reviewed publications. For the majority of those publications, he is the primary author. Additionally, he was on the editorial board for two medical journals and a reviewer for other journals.

In June 2011—six months before the trial of this case—Dr. Patsner ended his academic appointment at Baylor 2011 and began working in Seoul, South

Korea, on a three-year contract. He held two positions in Seoul: (1) Adjunct Clinical Professor of Obstetrics and Gynecology at Severance Hospital, Yonsei College of Medicine, and (2) full-time tenure-track Professor of Law and Director of Health Law and Policy at Yonsei Law School, Yonsei University. As an adjunct professor at Yonsei College of Medicine, he trained medical students, residents, and fellows in gynecology and gynecologic oncology and was "heavily involved" in their instruction. Furthermore, he would "directly teach medical students, residents in Obstetrics-Gynecology, and fellows in Gynecologic Oncology and Minimally Invasive Surgery at Yonsei Medical School/Severance University Hospital." He testified that his work at the Yonsei medical school was "the same stuff I've been doing since 1983."

Additionally, while in Korea, Dr. Patsner "regularly lecture[d] on benign gynecology and gynecological oncology topics at University Hospital teaching conferences, and [was] an active participant in the Gynecological Oncology Tumor Board at Yonsei Medical School." Dr. Patsner attended gynecology and gynecological oncology patient-care conferences, during which pre-operative patients were discussed, and was "an active participant" at monthly surgical morbidity and mortality conferences at the medical school. He stated that "[a]t all of these conferences" he and other faculty members would "make patient care recommendations, which include[d] surgical and overall treatment

16

recommendations." According to Dr. Patsner, these discussions focused on the "selection of surgical procedures, route of surgery (open, laparoscopic, vaginal), as well as intense and focused discussions on anticipation of operative complications, proper techniques for recognition of surgical complications, and management of same."

At the time of trial, Dr. Patsner also had an ongoing affiliation with Baylor College of Medicine and the National Institutes of Health. He explained, "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory. In fact, I'm meeting with them tomorrow, unless I'm here . . . ."

Though in Korea, Dr. Patsner continued to maintain his medical licenses in several states in the United States, allowing him to be an attending physician, order tests, and write prescriptions. He did not, however, have staff privileges at any hospital at the time he testified; therefore, he could not admit a patient to a hospital.

He characterized his work at the time of trial as follows: "I'm still very active in obstetrics and gynecology even though I also am a law professor" in Korea. "I've worked with residents in clinic and in the operating room my entire career, which I guess now is—it's 32 years." Regarding hysterectomies specifically, Dr. Patsner testified in his deposition—which the trial court had

before it—that he had performed and taught LAVH-related techniques "continuously since the early 1990s, and [has] lectured at the medical student, resident, fellow, and attending level on this subject and related subjects (care of the surgical patient, management of complications) since that time as well." He testified that he was the first person in the United States to incorporate the use of a new stapler design in a cervical cancer hysterectomy. In his expert report—which was also before the trial court—Dr. Patsner estimated that he had directly performed or first-assisted 450 laparoscopic hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.

Dr. Patsner testified at trial that he was leaving in one week to take a surgical team to Honduras for a two-week visit, focused on women's cancer, during which he would be teaching medical students, residents, and surgical fellows; it would be "hands-on." Although Dr. Patsner agreed at trial that he had not performed an LAVH since 1999, he testified that he had worked in operating rooms as recently as two months before trial in Taiwan.

The question, then, is whether Dr. Patsner's work at the time of his testimony was "practicing medicine" within the meaning of section 74.401, such that Dr. Patsner could qualify as a medical expert and opine whether Dr. Benge was negligent in the medical care of Williams. *See* TEX. CIV. PRAC. & REM. CODE

18

ANN. §§ 74.401–.403 (concerning qualifications of expert in medical liability case).

## 2. What it means to "practice medicine"

The qualifications required to testify as an expert in a health care liability suit are found in Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401–.403. Whether an individual is qualified to provide expert testimony is a question of law to the extent that it involves a question of statutory construction. *Vicento*, 164 S.W.3d at 729–30.

Dr. Benge argues that Dr. Patsner's work in Korea does not qualify as "practicing medicine" because he neither examined nor admitted patients to hospitals there. Williams responds that Dr. Patsner's work, viewed in its entirety, meets the general, commonly accepted understanding of the term "practicing medicine" sufficient to meet the statutory requirement that he be practicing medicine at the time of his testimony. We agree.

## 3. Giving meaning to phrase "includes, but is not limited to"

"Practicing medicine" is statutorily defined. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(b). It "includes, but is not limited to," training residents and medical students and serving as a consulting physician to other physicians. *Id.* The term "includes" is not defined in Chapter 74; however, the Government Code defines "includes" as a term "of enlargement and not of limitation or exclusive

19

enumeration, and use of [includes] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (West 2013); *see Vicento*, 164 S.W.3d at 731 (applying Government Code's definition of "includes" when analyzing section 74.402 of Texas Civil Practice and Remedies Code defining "practicing health care"). Likewise, it has been stated that "[t]he verb *to include* introduces examples, not an exhaustive list." ANTONIN SCALIA & BRYAN GARNER, READING LAW 132 (2012). Thus, a statutory definition that specifies that it "includes but is not limited to" certain activities will be read to allow within it other, non-enumerated activities as well. *Cf. Benavides v. Garcia*, 278 S.W.3d 794, 797 (Tex. App.—San Antonio 2009, pet. denied) (interpreting same provision—section 74.401—and holding that witness who was practicing medicine as *locum tenens* physician—defined as physician who substitutes for another temporarily—qualified as "practicing medicine" and as expert witness). Accordingly, we conclude that section 74.401's use of phrase "includes, but is not limited to" requires that the activities that qualify as "practicing medicine" not be restricted to training at an accredited medical school and serving as a consultant to physicians as detailed in section 74.401(g).

### 4. Definitions of "practicing" and "medicine"

Dr. Benge argues that, even if the phrase "practicing medicine" includes more than the two examples listed in the statute—i.e., training and consulting—it

20

must be limited to physicians who actively are examining or admitting patients into hospitals. Again we disagree.

To ascertain legislative intent, we first look to the plain meaning and common usage of the words chosen by the Legislature. TEX. GOV'T CODE ANN. § 311.011 (West 2013); *see St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997) ("The Legislature's intent is determined from the plain and common meaning of the words used."). The word "practice" means "to be professionally engaged in" a subject. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 974 (11th ed. 2003). The word "medicine" is defined as "the science and art dealing with the maintenance of health and the prevention, alleviation, or cure of disease." *Id*. at 771. The phrase "practice of medicine" has been given its own definition: "the learned profession that is mastered by graduate training in a medical school and that is devoted to preventing or alleviating or curing diseases and injuries."[4]

Accordingly, we conclude that the phrase "practicing medicine" in section 74.401(a)(1) includes a variety of tasks performed by licensed physicians, professionally engaged in preventing, alleviating, and curing diseases and injuries. A physician may be devoted to preventing, alleviating, or curing diseases and

---

[4]     "Practice of medicine," http://www.webster-dictionary.org (last visited Oct. 23, 2014); "Practice of medicine," http://www.thefreedictionary.com (same); "Practice of medicine," http://www.definitions.net (same).

21

injuries through tasks other than "treating" or "admitting" patients. *Cf. Schneider v. Fried*, 320 F.3d 396, 407 (3d Cir. 2003) (holding that trial court erred by excluding cardiologist expert who had stopped performing angioplasties but continued to advise interventional cardiologists who performed angioplasties).

Further, because the statute uses the phrase "includes, but is not limited to," we conclude that the "practicing medicine" requirement for medical liability experts allows for geographical movement so long as the physician continues to professionally engage in and actively use his medical knowledge as the statute requires. *Cf. Peterson v. Shields*, 652 S.W.2d 929, 930–31 (Tex. 1983) (rejecting locality rule); *TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 321 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (stating that the term physician "does not impose any geographical limits"); *accord N.H. Ins. Co. v. Allison*, 414 S.W.3d 266, 274 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Dr. Patsner received his training and board certification in the United States and practiced and taught medicine in Houston the majority of his career. This case does not concern the qualification of a physician who trained, practiced, and taught in another country and then came to Texas to testify.

In conclusion, we construe "practicing medicine," within the context of section 74.401, to include a physician who is licensed to practice in the United States, has actively practiced medicine by consulting with other physicians and

22

teaching medical residents in Texas, and then moved to another country where he continues to consult with that country's physicians and teach its medical residents, all the while maintaining his affiliation with a Texas medical school, working on NIH grants, and teaching—with hands-on involvement—surgical procedures abroad through volunteer service. *See* TEX. CIV. PRAC. & REM. CODE ANN. §74.401; *Larson*, 197 S.W.3d at 304–05 (stating that "expert qualifications should not be too narrowly drawn").

## C. Trial court did not err in concluding that Dr. Patsner was practicing medicine

Once we interpret the applicable statute as a matter of law, the issue of whether a particular witness qualifies as an expert under that statute is left to the trial court's discretion. *See Broders*, 924 S.W.2d at 151; *Daniels*, 175 S.W.3d at 893. We will not find that the trial court abused its discretion in finding Dr. Patsner was qualified unless it acted without reference to any guiding rules or principles. *Daniels*, 175 S.W.3d at 893–94; *Larson*, 197 S.W.3d at 304–05.

The following evidence supports the trial court's ruling:

- Dr. Patsner's substantive (versus temporal) qualifications are unchallenged. Dr. Patsner is a board-certified gynecologist and has maintained his certification at all times relevant to this suit. He has years of experience practicing and teaching in the area of gynecology.

- Dr. Patsner has expertise in the very issue presented in this case; he estimates that he has directly performed or first-assisted 450 laparoscopic hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.

23

- Dr. Patsner continued to participate "hands-on" in gynecological cancer surgeries up to and after the date of his testimony through international aid work.

- Dr. Patsner's work in Korea, where he had begun working by the time the case went to trial, was substantially similar to the work he performed at Baylor and Ben Taub.

- The time period between Dr. Patsner's last teaching assignment at Baylor and his teaching assignment in Korea was relatively short.

- Dr. Patsner's expertise in gynecology was recognized by Ben Taub, where he was appointed the Assistant Director of Gynecological Oncology and ran four clinics weekly.

- Dr. Patsner performed similar teaching tasks in Korea as he had at Baylor College of Medicine, a research and teaching hospital in Houston. While the record is silent on whether the Yonsei medical school—as opposed to the affiliated teaching hospital—is accredited, his professional work was functionally equivalent to the teaching he had been doing at Baylor several months before his trial testimony.

- Dr. Patsner maintained, through the date of trial, an affiliation with Baylor in Texas: "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory."

We conclude that the trial court did not abuse its discretion in admitting Dr. Patsner's testimony. *See Broders*, 924 S.W.2d at 151. We therefore overrule Dr. Benge's first issue.

### *Casteel* Challenge to Broad-form Negligence Question

In his second issue, Dr. Benge argues that the "trial court erred when it mixed valid and invalid legal theories in a broad-form jury question over Defendants' objection." According to Dr. Benge, the broad-form question mixed a valid theory (negligence) with an invalid theory (lack of consent). Dr. Benge

contends that the mixing of these two theories violated *Crown Life Insurance Company v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

The standard of review for claims of charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E. B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 122 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Therefore, we review a trial court's decision to deny a requested instruction under that standard of review. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). An instruction that might aid the jury in answering the jury questions is proper. *Id*. When a trial court refuses to submit a requested instruction, "the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). If the jury charge was erroneous, we must then consider whether the error requires reversal. *Powell*, 356 S.W.3d at 122.

## A.   What constitutes a *Casteel* problem

*Casteel* and its progeny teach that a jury charge is erroneous when a jury answers a single broad-form liability question affirmatively, the single liability question incorporates multiple legal theories, and at least one of those legal theories does not support liability as a matter of law and therefore is invalid.[5] *Casteel*, 22 S.W.3d at 387–89. The "erroneous commingling of valid and invalid

---

[5]   Mixing valid and invalid damages elements also creates a *Casteel* problem. *Harris Cnty. v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002).

25

theories of liability in a broad-form liability question" makes it impossible for an appellate court to "determine whether the jury based its verdict on an improperly submitted theory." *Burbage v. Burbage*, No. 12-0563, 2014 WL 4252274, at *4 (Tex. Aug. 29, 2014).

A theory may be invalid for a variety of reasons, including lack of standing (*Casteel*, 22 S.W.3d at 387–89), lack of supporting evidence (*Romero v. KPH Consolidation, Inc. d/b/a Columbia Kingwood Medical Center*, 166 S.W.3d 212, 225, 227–28 (Tex. 2005)), or a failure to plead it (*Texas Commission on Human Rights v. Morrison*, 381 S.W.3d 533, 537 (Tex. 2012) (plaintiff did not claim denial of promotion, only wrongful termination and retaliation, and could not do so because she did not pursue that claim before EEOC)). "A trial court errs by submitting to the jury theories of liability that are not legally viable—e.g., liability theories that [1] have not been pled, [2] are not supported by the legally sufficient evidence, or [3] are not supported by operative law." *Powell*, 356 S.W.3d at 123. Thus, the inquiry is not limited to whether an invalid theory was pleaded. If one of the plaintiff's legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a *Casteel*-type charge error. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863–65 (Tex. 2009) (broad-form negligence

26

question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury impermissibly found hospital liable for acts of doctor where evidence raised that possibility).

In *Casteel*, the theory was invalid due to an issue of standing. 22 S.W.3d at 387–89. The plaintiff asserted that the defendant engaged in a number of unfair or deceptive practices that violated the Insurance Code and DTPA. *Id.* at 381–82. In response to a single broad-form question, the jury found the defendant liable. *Id.* at 387. Because the liability theories were combined in a single question, it was unclear if the jury had assigned liability based on a finding of an Insurance Code violation or DTPA violation. *See id.* The plaintiff could not recover on four DTPA claims because he was not a consumer. *Id.* at 387–88. The Texas Supreme Court held that when a jury question mixes valid and invalid liability theories and it cannot be determined on which theory the jury based its liability finding, appellate courts will presume harm, reverse, and remand the cause for a new trial using a legally correct jury charge. *See id.* at 387–90. To avoid this risk, "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277 . . . ." *Id.* at 390; *see also Powell*, 356 S.W.3d at 123 (stating that "judicial

27

economy may favor separate submission of liability theories to prevent the need to re-try the cause of action if the trial court reaches an incorrect decision with regard to which theories of liability should be submitted to the jury.").

In this case, the jury was asked a single liability question, phrased as "negligence." We first consider whether the question effectively presented the theory of informed consent in addition to surgical and post-surgical negligence, taking into consideration Williams's evidence and arguments as well as the overlapping nature of the negligence and informed consent theories. We conclude that, as a result of the combination of these circumstances, the single question here effectively included two distinct liability inquiries.

## B.     Williams's theories of liability

Williams argues that the charge does not violate *Casteel* because Dr. Benge's disclosures, or lack thereof, "are simply facts, not theories of liability." While evidence of Dr. Giacobbe's experience was a relevant fact, and not a pleaded theory of liability, the evidence regarding the disclosures went far beyond simply the facts. Evidence regarding the disclosure issue was a major theme of Williams's case and was explicitly incorporated into liability questions asked of her expert, Dr. Patsner.

The jury was asked only one liability question: "Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in

28

question?" Blanks were provided to allow the jury to assign liability to Dr. Benge, Dr. Thornton, and Williams. Negligence, with respect to Dr. Benge, was defined for the jury to mean "failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances."

Throughout trial, Williams presented evidence on and argument about the standard of care, meaning what an obstetrician/gynecologist of ordinary prudence would have done during or after her hysterectomy. Under one of Williams's theories, either Dr. Benge or the resident perforated Williams's bowel, causing feces to enter her abdominal cavity, which ultimately resulted in sepsis, multiple operations, a lengthy coma, and an irreversible colostomy. Williams contended that an ordinarily prudent gynecological surgeon would not have made such an error and, therefore, Dr. Benge was negligent.

She further contended that an ordinarily prudent gynecological surgeon would not have allowed such an inexperienced resident to perform a large portion of the surgery, as Dr. Benge did. Dr. Giacobbe's level of experience and Dr. Benge's knowledge of that information were both relevant to that claim. Relatedly, and to the extent it was Dr. Giacobbe who erred, the parties do not dispute that Dr.

29

Benge, as Williams's surgeon with a supervising role over the resident, was legally liable for both his own surgical errors and those of the resident he was supervising.

The surgical error claim, in its many iterations—i.e., that Dr. Benge was liable if he (1) negligently perforated Williams's bowel, (2) negligently allowed Dr. Giacobbe to actively participate in the surgery resulting in Dr. Giacobbe perforating the bowel, or (3) reasonably allowed Dr. Giacobbe to operate but then was legally liable when she perforated Williams's bowel—was not the only theory Williams presented to the jury.

Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision and he negligently failed to provide that information to Williams before the operation. Williams testified that she had no idea that a resident was going to do a substantial portion of her LAVH or that her surgery would be that resident's first experience performing such a procedure. Further, Williams testified that, had she known that information, she would not have agreed to the operation and, as such, would not have suffered any of her injuries. Williams testified that she was never orally informed that Dr. Benge would be assisted by a resident (as opposed to the written consent forms informing her that he might be assisted by a resident) or that the resident might or would perform a large portion of the surgery. Williams's expert, Dr. Patsner, testified that Dr. Benge's failure to

30

disclose Dr. Giacobbe's involvement to Williams fell below the standard of care. Under this theory, the question of what a gynecological surgeon of ordinary prudence would do was not addressed to either doctor's surgical techniques but, instead, whether the hired surgeon (Dr. Benge) should have disclosed to the patient that another surgeon with limited experience would perform a substantial portion of the operation. To complete the necessary elements for a finding of negligence under this theory, Williams presented evidence on causation and damages with Williams's testimony that she would not have consented to Dr. Giacobbe's substantial involvement had she known and with Dr. Patsner's testimony that, in his opinion, Williams's substantial injuries were caused by Dr. Giacobbe perforating her bowel. This second theory asserted that Dr. Benge was negligent and caused her injures simply by not telling Williams about Dr. Giacobbe.

Williams insists that the failure-to-disclose theme was a "small piece of evidence" supporting a finding of medical negligence. She correctly observes that jurors do not have to agree on the basis for the negligence and that even if jurors believed Dr. Benge "was wrong not to tell [Williams] about the resident's involvement," they still could have found that Benge used "poor surgical technique." She contends that the poor surgical technique claim was "the focus of the trial." Further, Williams asserts that evidence regarding these non-disclosures was offered to demonstrate that Benge was "deceitful," committed a "betrayal,"

31

and "broke a promise." Thus, the evidence, she urges, was presented "for the jury's credibility determination," not as a basis for finding liability. Dr. Benge does not dispute that evidence regarding Dr. Giacobbe's experience was relevant to the claim that Dr. Benge was negligent during the surgery. A reasonable jury could have determined that the amount of supervision required over an assistant and the tasks delegated to the assistant vary according to the resident's experience. However, he disagrees that the evidence was presented as just a "small piece" of the trial.

A review of the record reveals that Williams went beyond offering admissible facts regarding Dr. Giacobbe's background and Dr. Benge's knowledge of her limitations. Most significantly, Williams's medical liability expert testified that the failure to disclose was a violation of the standard of care:

> Q: Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident—doing this, her first-time procedure—was going to be performing a part of the surgery?
>
> A: Well, yes. . . . You can't have ghost surgeons.
>
> Q: Period? End of story?
>
> A: Period.

Dr. Patsner further testified:

> [Y]ou have to get consent from your patients that a resident is going to be do—is going to be with you in the operating room. . . . And do patients occasionally say no? Yes, they do. I mean, sometimes people

32

don't want to be operated on by people who haven't finished their training. Sometimes they want people with more experience. So the circumstances can vary. The—the standard of care is to get permission from the patient for everybody who's going to be operating on them.

Again Dr. Patsner testified:

> Q: Do you believe that Dr. Benge fell below the standard of care when he allowed someone without the express consent to operate on Lauren Williams?
>
> A: Yes.

Finally, Dr. Patsner testified:

> Q: The area of betrayal, the failure—the failure of Dr. Benge to explain who was doing the surgery on Ms. Williams—was that below the standard of care?
>
> A: Yes. It was outside the standard.
>
> Q: In your opinion, was that a breach of the standard of care? Was that negligent?
>
> A: Yes.[6]

---

[6] That testimony was disputed. Dr. Toy, a board certified physician who served as the residency program director where Dr. Giacobbe was a resident, testified that express permission by the patient for the resident to "perform a surgery" is not required because the resident is in an assistant role, always under the supervision of the attending physician and that the "standard of care does not require disclosure that the resident is putting hands on the patient." Dr. Zepeda, a defense expert witness, also discussed the standard of care. He testified that the standard consent form used by Dr. Benge granted permission for the use of a resident when completing the procedure. Finally, Dr. Benge testified that his practice with regard to disclosing resident participation in surgical procedures was consistent with standard practices and was reasonable. He further testified that his disclosure complied with American Medical Association guidelines for the use of residents during surgery when "the usual form of consent" is used and the named surgeon has "participatory supervision" over the resident's work. The AMA guidelines

Williams presented a repeated trial theme seeking liability based on the failure-to-disclose theory, which culminated in the final moments of jury argument with her request that the jury "send . . . a message" to the medical community that it can no longer rely on a "vaguely worded" disclosure forms to permit active participation by residents in the operating room. Williams asked for a finding of liability for failing to disclose more information about the participation of the resident, whom she described as a "secret surgeon."

This theme was established from the beginning of trial. Williams opened the trial by informing the jury: "We're suing Kelsey-Seybold for six reasons. First reason: betrayal by the Kelsey-Seybold doctor to bring in a surgeon who had no permission, who had no consent to put her hands on Lauren." Williams then told the jury that there were three "steps to betrayal": trust, vulnerability, and betrayal itself, which she described as letting a "secret surgeon, a first-time resident, do a significant part of this procedure."

During closing, Williams explained that she hired "his hands, his experience; but under anesthesia, she got another set of hands working on her . . . a

provide that, when the "usual form of consent to operation" is used, it is permissible for "the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, ie, the surgeon must scrub." On the other hand, "[i]f a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient."

set of hands she did not know, who had never done the job before, had no experience. You can't do this in our community." She then sought a jury verdict based on her "betrayal" theory:

> The best thing they can say is "We're good people. We didn't mean it. We're sorry. . . . The fact that we didn't tell them who was doing the surgery is—it should be of no concern to you because that's the way we want to do business." . . . [E]ach one of you—take it upon yourselves to make them change the way they do business.
>
> . . . .
>
> If you want this fiction to continue or to grow throughout the country, find for them. You are the conscience of the community. If that's what you want the standard to be, I'm telling you right now your job will be very quick. Go back and find for them. That will give them the approval. It'll give them the consent, and it will be publicized throughout the industry, "This is how you do it. Don't tell the patient. It makes things a whole lot easier. We can get a whole lot more training. You just don't tell the patient."

Williams told the jury that it could impact the practice within the medical community concerning "secret" surgeons:

> If you approve that standard today, that will become the standard. You disapprove that standard today, you send them a message, the standard changes. Our community is a safer place to live. That's why I say you are the caretakers of our community. You set the standard. You make it safer for everyone in this courtroom, all of their family, all of their friends, or you can sit silently by and let it continue. Your choice.

Given a one-minute warning at the conclusion of her closing argument, Williams asked the jury "to enforce the safety rules" through its verdict:

> If you choose to do so, if you think these rules are important and need to be enforced, say so by your verdict. You are the conscience of the community. If you don't think they're important, put zero, put zero, because your verdict will be heard. It will be heard by this

35

organization, this group. . . . They are going to go back doing the same thing they've been doing, not telling people about who's doing the operation.

The disclosure theory was a primary theme of the case.

If the jury, as Williams suggested, agreed that using a "secret surgeon" was not what they "want[ed] the standard to be," and further decided that the ordinarily-prudent-physician standard required disclosure of the resident's role, then this theory could have led the jury to conclude that Dr. Benge breached his general duty of ordinary care to Williams—completely independent of whether he or Dr. Giacobbe negligently perforated Williams's bowel. And it could have found causation because Williams testified that she would not have undergone the surgery if Dr. Giacobbe's role had been disclosed. This trial theme and the evidence presented to the jury created the possibility of a liability finding based on either of the two negligence theories: negligence during and after the surgery and negligence before the surgery in failing to disclose Dr. Giacobbe's participation or level of experience.

## C. The broad form negligence question effectively included an informed consent issue and therefore violated *Casteel*

Williams responds that the broad-form jury question did not include this second theory; it asked only a general negligence question, thus precluding a *Casteel* error. We therefore next examine whether a reasonable jury could have concluded that the general negligence question subsumed the informed consent

36

issue. Based on the evidence and arguments presented, we conclude that the jury could have, and therefore the broad-form charge violated *Casteel*.

An informed consent claim is a subspecies of a negligence claim. In such a claim, "the only theory on which recovery may be obtained is that of *negligence* in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (West 2011) (emphasis added); *see also Schaub v. Sanchez*, 229 S.W.3d 322, 323 (Tex. 2007) (stating that a plaintiff "can prevail on her informed consent claim only if she shows that the doctors negligently failed to disclose the procedure's risks or hazards. . . . [U]nder [the statute], lack of informed consent is a particular subspecies of negligence based on a failure to disclose the risks or hazards of a procedure."). And whether a physician was negligent in his treatment of a patient is a distinct legal question from whether the physician was negligent in failing to disclose to the patient the risks inherent in the treatment. *Felton v. Lovett*, 388 S.W.3d 656, 663 (Tex. 2012). A jury, therefore, should be asked separate questions for the two theories. *See Hawley*, 284 S.W.3d at 863–65.

Medical non-disclosure negligence claims are not the only negligence claims governed by specific principles of duty. For example, premises liability claims and negligent undertaking claims are negligence claims that have defined duty

standards. For these claims, a broad-form negligence question is erroneous and cannot support a judgment. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837–38 (Tex. 2000) (concluding that negligent undertaking claim requires three additional predicate instructions to determine if there is a duty to exercise ordinary care); *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex. 1997) (holding that broad-form negligence question that omitted elements of premises liability claim was insufficient); *see also Torrington*, 46 S.W.3d at 838 ("In premises liability cases, like undertaking cases, a possessor of land may be held liable only if certain conditions are met."); *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 362 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting that both premises liability and negligent undertaking claims involve different duties than basic negligence claims and holding that broad-form negligence submission was error for negligent undertaking claim); *Price Drilling Co. v. Zertuche*, 147 S.W.3d 483, 488 (Tex. App.—San Antonio 2004, no pet.) (when plaintiff's claim could "only be characterized as a premises liability claim," submission of ordinary negligence questions and instructions resulted in waiver of premises defect claim).

Williams contends that *Casteel* does not govern alternative factual assertions, only different liability theories. We agree, but do not find this distinction applicable in this case. In *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835 (Tex. App.—Fort Worth 2003, pet. denied), a

defendant hospital requested limiting instructions that the jury could not consider specific acts in its evaluation of negligence. *Id.* at 857–58. The trial court refused, and the hospital appealed. *Id.* The appellate court concluded that the case involved alternative factual allegations in support of a single legally grounded theory, not multiple liability theories, one of which was defective. *Id.* at 858–59.

The difference is critical. For example, in *Hawley*, a broad-form negligence question included an instruction that a hospital acts through its employees, agents, nurses and servants. 284 S.W.3d at 863. Yet the charge said nothing about the hospital's undisputed lack of liability for the conduct of a physician who acted as an independent contractor. *Id.* at 862–63. Although the charge's statement that a hospital acts through these four categories of individuals was not improper, the Court held that it was error to refuse an additional requested instruction clarifying this issue because the jury "could have considered" the physician as an agent of the hospital. *Id.* at 863. "The hospital's request was designed to prevent that from happening" by providing a proper limiting definition and instruction that would have assisted the jury. *Id.* at 863–64. Moreover, the plaintiffs did "not complain that the instruction would have 'tilted' the jury against them in some manner;" on the contrary, they asserted that the failure to give the instruction was not error because the issue was undisputed. *Id.* at 864.

Similarly, Dr. Benge submitted an instruction that would have clarified that Williams could not recover on an informed consent negligence theory: "You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." Dr. Benge's proposed instruction, which the trial court refused, would have properly limited the jury to the issue that Williams states was her only claim: negligent medical treatment during and after the surgery. And like the plaintiff in *Hawley*, Williams did not make any complaint about the substance of the proposed instruction in the trial court or on appeal. The instruction here did not tilt the jury insofar as the physicians' surgical technique and level of experience was at issue. Nor did it prevent the jury from considering Dr. Giacobbe's level of experience and Dr. Benge's knowledge of that information when he permitted Dr. Giacobbe to perform a large portion of the surgery. The proposed instruction would not have prevented the jury from considering that information to determine whether Dr. Benge or Dr. Giacobbe were negligent in their medical treatment of Williams; it only would have limited the jury from considering what Dr. Benge told Williams regarding that information—beyond the signed consent forms[7]—in deciding if he acted negligently.[8]

---

[7] The consent form states, "I [_____] voluntarily request Dr. [_____] as my physician and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to

Likewise, this case is similar to *Hawley* because although there was only a single jury question, the jury was presented with multiple theories in that one question and that error could have been easily resolved with a simple instruction. The instruction in *Hawley* asking whether the employees, agents, nurses or servants were negligent "effectively submitted four negligence questions." *Hawley*, 284 S.W.3d at 864. Here the single question also "effectively submitted" two different negligence questions.

The Texas Supreme Court in a second case also concluded that a single broad-form question violated *Casteel* even though the accompanying definitions and instructions did not explicitly contain multiple theories because the broad form subsumed within it an improper theory and evidence had been submitted in support of that theory. *Morrison*, 381 S.W.3d at 537. In that wrongful termination lawsuit, the jury was asked whether the defendant took "adverse personnel actions" against the plaintiff because of her opposition to an unlawful discriminatory practice. *Id*. at 536. The plaintiff presented evidence relevant to her wrongful termination claim

---

me (us) as [_____]." It continues, "I (we) understand that the physician may require other physicians including residents to perform important tasks based on their skill set and, in the case of residents, under the supervision of the responsible physician. (Residents are doctors who have finished medical school but are getting more training.)."

[8] An alternative instruction would have been that the jury could only consider whether the doctors' acts or omissions during or after the surgery constituted negligence. That would have prevented a finding of negligence based solely on the failure to disclose to Williams more information about the participating resident.

that she was denied a promotion, but she did not raise such a claim (and could not do so because it was not part of her underlying EEOC complaint). *Id*. at 537. The Court concluded that the charge violated *Casteel*. "Because the jury question allowed liability for 'adverse personnel actions,' the jury could have improperly found liability based upon the denied promotion." *Id*.

Williams repeatedly stressed to the jury that Dr. Benge did not inform her of Dr. Giacobbe's role or experience. Importantly, she also presented expert testimony that the failure to do so violated the standard of care. She disclaims that theory on appeal, stating "this is a surgical neglect case" and "the only question before the jury that's at issue in this appeal was on Benge's surgical negligence," and disclaiming that she "sought [any] recovery" on an informed consent claim. The jury, however, was unaware of this limitation, and the rejected instruction would have made this point clear for it.

The introduction of evidence admissible for multiple purposes does not in itself create a *Casteel* problem. But the broad-form negligence question here necessarily included a non-disclosure legal theory because the evidence explicitly included standard-of-care questions on informed consent. Much like a limiting instruction is appropriate when evidence is admissible for one purpose but inadmissible for another purpose, the requested instruction would have focused the jury properly on the issues of negligence during and after the surgery and away

42

from the theory of non-disclosure. Without the requested instruction, a jury in this situation "could have improperly found liability based upon" the unpleaded informed consent issues. *Morrison*, 381 S.W.3d at 537; *see also Hawley*, 284 S.W.3d at 863 (charge violated *Casteel* because jury "could have considered" physician as agent of hospital).

Finally, Williams asserts that a holding that the trial court abused its discretion in refusing to include the requested instruction is contrary to the preference for broad-form submission "whenever feasible." *See* TEX. R. CIV. P. 277; *Thota*, 366 S.W.3d at 688–89. But our system of justice likewise requires the jury to be properly instructed in the law and that broad form is appropriate only when it is feasible. *Casteel*, 22 S.W.3d at 388. We conclude that the broad-form medical negligence question here effectively subsumed an informed consent issue.

We next address whether Williams's second theory—a failure-to-disclose theory—was an invalid theory.

## D.   Whether Williams's "secret surgeon" theory of liability was valid as a stand-alone negligence claim

### 1.   Duty is a question of law

Because an informed consent claim is a subspecies of negligence, it includes the traditional elements of that claim: breach, causation, and damages. But like negligence claims, the threshold issue is whether there is a duty because, if there is no duty, there is no liability. *See Greater Hous. Transp. Co. v. Phillips*, 801

43

S.W.2d 523, 525 (Tex. 1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (superseded by statute on other grounds); *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993).

A jury cannot decide whether an individual has a duty; duty is a question of law left to the court's determination. *See Phillips*, 801 S.W.2d at 525; *see also Torrington*, 46 S.W.3d at 837–38. A jury finding that a defendant failed to use reasonable care cannot result in a negligence finding unless the plaintiff first establishes that the defendant had a legal duty to act. *See El Chico Corp.*, 732 S.W.2d at 311. We consider whether the law imposes a legal duty on a physician to disclose information about the level of a resident's participation beyond the standard disclosure form language used in this case that a "resident" may "assist" the surgeon, including performing "important tasks" during the surgery.

### 2.    No duty under TMLA

"Health care must be based on a patient's informed consent." *Felton*, 388 S.W.3d at 658. The Texas Medical Liability Act, which governs causes of action based on health care liability claims, sets forth the elements of a claim for failure to obtain informed consent. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.101. Under section 74.101, informed-consent claims are "based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards

44

involved in the medical care or surgical procedure rendered by the physician or health care provider." *Id.*

Section 74.102 implements the long-established rule that medical treatment requires a patient's informed consent, *see Binur v. Jacobo*, 135 S.W.3d 646, 654–55 (Tex. 2004), by creating a Texas Medical Disclosure Panel "to determine which risks and hazards related to medical care and surgical procedures must be disclosed by health care providers or physicians to their patients or persons authorized to consent for their patients and to establish the general form and substance of such disclosure." TEX. CIV. PRAC. & REM. CODE ANN. § 74.102 (West 2011). The Panel evaluates all medical and surgical procedures, determines if disclosure of risks is required, and if so, determines how much disclosure is required. *Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex. App.—Dallas 2007, pet. denied). The Panel creates two lists reflecting its conclusions, Lists A and B. "If the procedure requires some disclosure of the risks involved in the treatment, it is placed on List A. However, if the Panel determines that no disclosure is required, the procedure is placed on List B." *Id.* at 508–09 (citations omitted).

List A identifies the disclosures required for the medical procedures involved in this case: vaginal hysterectomy, fallopian tube and ovarian removal surgery, and abdominal laparoscopic procedures. *See* 25 TEX. ADMIN. CODE §§ 601.2(g)(2), g(3), & (s) (West 2014). It does not require any disclosure of the

45

experience or role of a resident surgeon. When a procedure is included on List A, conformity with its requirements creates a rebuttable presumption that the physician was not negligent. *Bryan*, 230 S.W.3d at 509; TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.104, 74.106(a)(1).

Because the presumption is rebuttable, we will examine whether there is any other source of a duty for Dr. Benge to disclose Dr. Giacobbe's level of participation or experience. *See Felton*, 388 S.W.3d at 660 (stating that if section 74.401 does not apply, the common law does); *Cf*. TEX. CIV. PRAC. & REM. CODE ANN. § 74.106(b) (when procedure is not covered by List A or B, issue is whether there is duty "otherwise imposed by law.").

### 3.    No duty under the common law

The common law imposes on "'[p]hysicians and surgeons [the] duty to make a reasonable disclosure to a patient.'" *Felton*, 388 S.W.3d at 660 (quoting *Wilson v. Scott,* 412 S.W.2d 299, 301 (Tex. 1967)). A reasonable disclosure will include "the risks that would influence a reasonable patient in deciding whether to undergo treatment but not those that would be unduly disturbing to an unreasonable patient." *Id*. at 661. The risks that must be disclosed are those "inherent" in treatment, meaning a risk "that 'exists in and is inseparable from the procedure itself.'" *Id*. (citation omitted). "Inherent risks of treatment are those which are directly related to the treatment and occur without negligence." *Id*. at 662. An

46

informed consent claim concerns "inherent risks" of the procedure—meaning negative results that can occur as a consequence of a properly performed procedure. It is the possibility of a negative consequence from a properly performed operation that is the operation's inherent risk. *Tajchman v. Giller*, 938 S.W.2d 95, 98–99 (Tex. App.—Dallas 1996, writ denied).

By contrast, a physician has no duty to disclose the risks that the surgery "may be based on an erroneous diagnosis or prognosis, or that it is negligently performed." *Felton*, 388 S.W.3d at 662. "Malpractice . . . is an extraneous risk, one that inheres in the practice of health care, not in the care itself." *Id.* "[O]nly inherent risks of a procedure—risks that arise from the procedure itself and not from any defect in the procedure or negligent human intervention—need be disclosed." *Tajchman*, 938 S.W.2d at 99. The common law does not, therefore, recognize a duty to disclose such non-inherent risks and failure to disclose them cannot support a liability finding.

Williams's resident-disclosure theory does not concern a risk or hazard inherent to her hysterectomy surgery; this theory concerns the possibility that an inexperienced resident assisting in the surgery might negligently perform the operation and that Dr. Benge might negligently supervise her performance by not catching her error or by allowing her to do more of the surgery or too complex an aspect of the surgery given her limited experience. These are extraneous risks.

No Texas authority has recognized a duty to disclose the level of participation by the resident or that resident's experience level. *See Haynes v. Beceiro*, 219 S.W.3d 24, 27 (Tex. App.—San Antonio 2006, pet. denied) (medical battery case; signature on standard consent and disclosure form permitted active participation in surgery by another doctor because patient consented to her chosen doctor and other "such associates" he deemed necessary to perform surgery); *cf. Avila v. Flangas*, No. 04-95-00106-CV, 1996 WL 63036, at *2 (Tex. App.—San Antonio Feb. 14, 1996, no writ) (mem. op., not designated for publication) (holding that claim that defendant physicians failed to disclose their inexperience was not inherent risk and therefore did not need to be disclosed; claim concerned negligent human intervention).

While Williams did not sue under a medical battery theory, that cause of action raises issues similar to those underlying Williams's informed consent theory. Medical battery is defined as performing a medical act or treatment on a patient without consent. *See Haynes*, 219 S.W.3d at 26. In *Haynes*, the plaintiff could not prevail on a medical battery claim against an assisting surgeon who participated in her surgery, even though she explicitly informed the surgeon's staff, before her procedure, that "[s]he does not want to see anyone else—or have anyone else do surgery" besides the surgeon she selected. *Id.* at 25. The Disclosure and Consent Form she signed stated that she was "voluntarily request[ing]" her

chosen surgeon "and such associates, technical assistants and other health care providers as they may deem necessary to treat my condition . . . ." *Id.* The court held that consent, therefore, was given for the second surgeon to participate in her procedure. *Id.*; *cf. Lane v. Anderson*, 802 N.E.2d 1278, 1282–84 (Ct. App. Ill. 2004) (holding, in medical battery case addressing level of participation by resident, that plaintiff does not have medical battery claim, as matter of law, against resident who "performed a majority of the surgery" because, by signing consent form, plaintiff consented to selected surgeon and his assisting resident, "regardless of the degree to which [the resident] participated").

### 4. Conclusion on duty

The Legislature has created a comprehensive statutory scheme concerning disclosure and informed consent law, and it is the Legislature's prerogative to expand the level of disclosure required, should it see fit. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.101–.107. Mindful of the statutory framework and following the analysis in *Haynes*, we conclude that Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon's anticipated level of participation or experience. We further conclude that an assertion of medical negligence that characterizes the failure to disclose this information as a breach of duty presents an invalid legal theory.

We address next whether Dr. Benge preserved error on his *Casteel* challenge.

## E.      Whether Dr. Benge preserved *Casteel* error

Any complaint to a jury charge, including "complaints of error in broad-form submission," is waived unless a party "make[s] the trial court aware of the complaint, timely and plainly, and obtain[s] a ruling." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). Objections must both "clearly designate the error" and "explain the grounds for complaint." *Burbage*, 2014 WL 4252274, at *6. An objection must "explain the nature of the error" so the trial court may correct it. *Id*. at *7.

Williams contends that Dr. Benge waived any error in the jury charge by failing to object during trial to questions asked of him on cross-examination about his non-disclosure of Dr. Giacobbe's level of experience and surgical participation.[9] However, the issue Dr. Benge raises on appeal is a legal one related to jury-charge error, not an evidentiary issue. Mid-trial evidentiary objections were not necessary to preserve this complaint. *See Felton*, 388 S.W.3d at 660 & n.9 (noting that purely legal issues, which do not affect jury's role as fact-finder, will preserve error even if raised for first time in post-verdict motions). Moreover, Dr.

---

[9]      Williams does not contend that the charge objection did not advise the trial court of the *Casteel* problem or that the proposed instruction was incorrect or confusing.

Benge asserted during the presentation of the evidence that Williams was improperly injecting a consent theory into the case.

After the parties rested, the court held an informal charge conference. During the informal conference, Dr. Benge asked for the following instruction:

> You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Williams responded, "It's not an informed-consent case. It's whether or not Dr. Benge acted properly when he didn't do part of the surgery and let someone else do it. That's what the case is about . . . It's not an informed-consent case. It's a negligence case." In reply, Dr. Benge asserted that Williams therefore should have no objection to the instruction. When the court asked why the instruction was necessary, Dr. Benge responded that evidence had been presented on the consent issue. He further stated, "But the problem is the jury very well could focus on [informed consent] and could decide, 'Boy, I wish they would have given Ms. Williams more information. She might not have allowed Dr. Giacobbe to be involved.' That is informed consent, which isn't in the case." The trial judge stated that she would not give the instruction.

During the formal charge conference, Dr. Benge objected to the broad-form liability question as follows: "[D]efendants object to Question Number 1, negligence, because the broad-form submission allows the jury to base its finding

51

on a violation of informed consent . . . ." The objection was overruled. In an effort to reduce the possibility that the jury would assign liability for failing to disclose the resident's involvement, Dr. Benge requested the same instruction that he had requested during the informal charge conference. The requested instruction was refused.

Dr. Benge specifically objected to the broad-form nature of the liability question and advised the trial court that a liability finding could be based on the informed consent theory that Williams presented. Subsequently, Dr. Benge offered an instruction that would have prevented the jury from finding negligence based on a failure to inform. While he did not cite *Casteel*, it was unnecessary for him to do so. *Morrison*, 381 S.W.3d at 536 ("*Casteel* error may be preserved without specifically mentioning *Casteel*."); *Thota*, 366 S.W.3d at 691 ("[Appellant] did not have to cite or reference *Casteel* specifically to preserve the right for the appellate court to apply the presumed harm analysis . . . ."). His objection informed the trial court that the broad-form negligence question mixed general negligence and informed consent issues. His proposed instruction attempted to carve out the informed consent issue from the broad-form negligence question. Dr. Benge, therefore, apprised the trial court of the error "such that the court [had] the opportunity to correct the problem." *Burbage*, 2014 WL 4252274, at *7; *see also Thota,* 366 S.W.3d at 690–91 (holding the charge error was sufficiently preserved).

52

And the instruction did so while allowing the jury to consider the evidence of Dr. Giacobbe's inexperience: it only precluded a negligence finding based on what Williams was told about that experience. Thus, the jury could have relied on her experience not only in evaluating her conduct during the surgery, but also Dr. Benge's supervision of her during the surgery. In short, Dr. Benge's proposed instruction did not detract the jury from focusing on the claimed acts of negligence during and after the surgery.

We conclude that Dr. Benge's complaints were sufficient to alert the trial court to the potential deficiency in the jury charge that set up a *Casteel* problem, merging valid and invalid theories of liability into a single, broad-form liability question. *See Morrison*, 381 S.W.3d at 536 (holding in wrongful termination lawsuit that complaint that charge improperly lumped different employment actions together was sufficiently identified to preserve error even though employer did not state during charge conference that question mixed legally valid and invalid theories or, as phrased by intermediate appellate court, in *Texas Commission on Human Rights v. Morrison*, 346 S.W.3d 838, 847–48 (Tex. App.—Austin 2011), *rev'd*, 381 S.W.3d 533 (Tex. 2012), "that it was concerned about legally invalid theories"). As the Texas Supreme Court has explained,

> There should be but one test for determining if a party has preserved error in the jury charge, and that is *whether the party made the trial court aware of the complaint*, timely and plainly, and obtained a

53

ruling. The more specific requirements of the rules should be applied . . . to serve rather than defeat this principle.

*State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (emphasis added); *see also Thota*, 366 S.W.3d at 690. We conclude that Dr. Benge preserved error in the jury charge.

Having concluded that Dr. Benge preserved error, we turn next to whether the commingling of the valid and invalid theories was harmful error.

**F.      *Casteel* error requires reversal**

Williams contends that there was sufficient evidence for the jury to find that Dr. Benge or Dr. Giacobbe operated below the standard of care when one or the other perforated Williams's bowel during surgery. Thus, she concludes, any error is harmless.

When an invalid legal theory is mixed with one or more valid theories at trial and the jury is given only a broad-form liability question to which a proper objection is made, an appellate court will presume error because it cannot be determined if liability was based on a valid theory or solely on one of the invalid theories. *See Casteel*, 22 S.W.3d at 378–79; TEX. R. APP. P. 44.1(a)(2). The appellant is left unable to demonstrate the consequence of the trial court's jury charge error because it is unclear on what the jury based its decision. *Casteel*, 22 S.W.3d at 388.

Similar to the argument presented by Williams, the plaintiffs in *Hawley* argued that any jury charge error (which resulted because the jury could have reasonably—but erroneously—interpreted the charge to allow vicarious liability on the hospital for a physician who was not its agent) was harmless because the jury could have found negligence based on the nurses' acts or omissions. 284 S.W.3d at 864. But the Court held that the error was harmful, nevertheless, because it was impossible to determine whether the jury held the defendant hospital negligent based solely on the conduct of the physician or based on the conduct of the other individuals for whom the hospital had vicarious liability. *Id.* at 864–65. Thus, the Texas Supreme Court could not tell whether the jury thought the hospital was liable under a valid theory (negligence based on negligent acts by its nurses) or an invalid theory (negligence based on the negligent acts of the independent contractor physician). *Id.* At all times, the only "liability theory" was negligence; however, one of the two bases for a liability finding had no support under Texas law. *See id.* The Court presumed that the jury charge caused harm. *Id.* at 865.

Similarly, the mixing of an invalid theory with a valid theory was harmful and required reversal in *Romero.* 166 S.W.3d at 227–28. There, the plaintiff sued a hospital for malicious credentialing of a surgeon who was a known drug abuser. *Id.* at 217–19. The plaintiff also claimed the hospital was negligent in delaying a blood transfusion during surgery. *Id.* The charge included a single, broad-form,

55

apportionment-of-liability question. *Id.* at 215. The jury found the hospital liable under both theories and assigned it a percentage of responsibility. *Id.* at 214–15. The Texas Supreme Court concluded, however, that there was no evidence of malicious credentialing. *Id.* at 224. It further found that the broad-form apportionment question made it impossible to determine how much of the hospital's assigned responsibility was due to the impermissible malicious credentialing theory versus the allowed negligent delivery-of-blood theory. *Id.* at 226. Citing *Casteel*, the Supreme Court explained, "Even if the jury *could* still have made the same apportionment of fault, the error in the question is nevertheless reversible because it effectively prevents Columbia from complaining on appeal that they *would not* have done so." *Id.* The plaintiff could not avoid reversal by arguing that the jury might have reached the same apportionment of responsibility. *Id.*

Likewise, the Court in *Morrison* rejected the plaintiff's argument that, when an invalid theory is not directly submitted to the jury but is merely subsumed within broad language, "the mere possibility the jury may find liability based on an invalid theory does not constitute harm." *Morrison*, 381 S.W.3d at 537. The Court explained: "The harm to [the Appellant] is not that the jury reached the wrong verdict, but rather that [the Appellant] has been prohibited from demonstrating on appeal that the jury's verdict was based upon the invalid legal theory." *Id.*

Here, Williams argued two alternative legal bases for finding Dr. Benge negligent: (1) either Dr. Benge or the resident physician for whom he was responsible were negligent during or after the surgery or, alternatively, (2) Dr. Benge failed to disclose Dr. Giacobbe's role or experience beyond the statements contained in the signed disclosure forms and such failure was below the standard of care and, therefore, negligent. The first is a valid theory of liability, but the second is not. Williams repeatedly urged the jury to answer the liability question affirmatively on the basis of this invalid legal theory.

From this record, we cannot say that the jury was not significantly influenced by the disclosure issue. We therefore sustain Dr. Benge's second issue and must reverse.

## Conclusion

Having sustained Dr. Benge's second issue, we reverse and remand the case for a new trial. In doing so, we do not reach Dr. Benge's third issue challenging the denial of periodic payments.

All pending motions are denied as moot.

Harvey Brown
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Justice Keyes, dissenting.

57