Chief Justice Hecht delivered the opinion of the Court.
At the trial of this healthcare-liability case, the patient argued and offered evidence *468 that her physician was negligent both in using an inexperienced resident to assist with performing her surgery and in not disclosing the resident's level of involvement, although she does not claim a right to recover for the nondisclosure. The jury was asked simply whether the physician was negligent without being instructed not to consider the nondisclosure. A divided court of appeals concluded that the trial court's refusal to instruct the jury as requested was harmful error,[1] and we agree. The appeals court also concluded that the patient's expert was "practicing medicine" at the time of trial and thus qualified to testify.[2] Again, we agree. We affirm the judgment of the court of appeals remanding the case to the trial court for a new trial.
I
During a laparoscopic-assisted vaginal hysterectomy ("LAVH") to remove her uterus, ovaries, and fallopian tubes, Lauren Williams, 39, suffered a bowel perforation that was not immediately diagnosed, resulting in catastrophic post-surgical consequences. She sued the surgeon, Dr. Jim Benge, a board-certified obstetrician and gynecologist, and his practice group, Kelsey-Seybold Medical Group, PLLC (together referred to as "Dr. Benge"). The jury found that Dr. Benge's negligence caused Williams' injuries. We summarize the evidence in the light most favorable to the verdict.[3]
A week before the surgery, Dr. Benge and Williams discussed the LAVH procedure and reviewed written consent forms setting out all required disclosures of risks, including damage to the bowel. By filling out the forms and signing them, Williams stated:
I Lauren R. Williams voluntarily request Dr. Benge as my physician, and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition ....
* * *
I ... understand that the physician may require other physicians including residents to perform important tasks based on their skill set and, in the case of residents, under the supervision of the responsible physician. (Residents are doctors who have finished medical school but are getting more training.)
Dr. Benge testified that in explaining the consent forms, he told Williams that he "would be doing the surgery with an assistant." Williams testified that Dr. Benge did *469 not tell her the resident would actually be performing part of the surgery.
Dr. Benge was assisted by Dr. Lauren Giacobbe, a resident in the third year of a 4-year program. Dr. Giacobbe had significant experience with hysterectomies and laparoscopic surgeries, but she had not previously assisted with an LAVH surgery, a fact Dr. Benge did not disclose to Williams. Dr. Giacobbe testified that she explained to Dr. Benge her experience level before the surgery began and that he determined the tasks she would perform. She also testified that she introduced herself to Williams on the morning of the surgery and told Williams that she was a resident and was going to be assisting Dr. Benge with the surgery. Dr. Giacobbe admitted she did not identify the surgical tasks she would perform but explained that she did not know those details until after the surgery began. Williams testified that she did not speak with Dr. Giacobbe on the morning of her surgery and would not have undergone the surgery if she had known it was Dr. Giacobbe's first time assisting an LAVH procedure.
Dr. Benge and Dr. Giacobbe both estimated that Dr. Giacobbe performed 40% or less of the surgery, but Dr. Giacobbe reported to the hospital in her resident-experience log that she had performed 50% or more. During the laparoscopic part of the procedure, Dr. Benge operated on Williams' right side, demonstrating each step for Dr. Giacobbe, and showing her "how to use the instruments and what to do". Dr. Giacobbe then repeated the same thing on the left side.
When they finished, Dr. Benge examined the surgical area, saw no sign that Williams' bowel had been perforated, and noted no complications in the post-operative report. But within hours, Williams began to complain of severe pain, abdominal tenderness, and nausea. By the time Dr. Benge saw Williams the next morning, she had a fever and was anemic, tachycardic, and in constant pain. Dr. Benge started her on intravenous antibiotics and ordered an x-ray of her chest to ensure that she did not have pneumonia. He did not suspect that she had a perforated bowel. Dr. Benge did not see Williams again that day because he went home ill.
Williams' condition continued to deteriorate. She began experiencing rectal bleeding. Her hemoglobin and hematocrit levels fell significantly. She required a multi-unit blood transfusion and continued experiencing constant pain. Three days post-surgery, a gastroenterologist diagnosed her with a bowel perforation that was leaking feces from her intestines into her abdomen. The doctors repaired the perforation, which was on Williams' left side where Dr. Giacobbe had operated, but a colostomy was required. Williams developed sepsis, underwent a tracheotomy, was put on a mechanical ventilator, and remained in a chemically induced coma for 3 weeks. Once discharged, she required home health assistance for an extended recovery period and was unable to work.
Williams had a second surgery to reverse the colostomy, but it could not be completed successfully, and the colostomy was replaced with an ileostomy. A third surgery to replace the ileostomy with another colostomy was successful, but the colostomy became permanent. Williams has had 2 subsequent surgeries to address complications related to the colostomy.
Dr. Benge testified that the bowel perforation likely resulted from an arc of electricity from a Bovie, an electrical cutting and cauterizing instrument used during the surgery to both cut and fuse tissue and to stop bleeding. The instrument was near *470 the weighted speculum,[4] which was touching the bowel. Even though no immediate damage to the bowel tissue was visible at the time of the surgery, Dr. Benge testified that it was possible for an electric arc to pass from the Bovie to the speculum without being seen, causing a thermal injury to Williams' bowel tissue below.
Williams' expert, Dr. Bruce Patsner, testified that the perforation was caused by a surgical cut, not an electric arc. The error, he believed, was more likely made by Dr. Giacobbe, the less-experienced resident, than by Dr. Benge. Dr. Patsner further opined that Williams' unusual post-surgery discomfort should have raised Dr. Benge's suspicion that she had a bowel injury. Dr. Patsner concluded that by failing to properly supervise Dr. Giacobbe and to timely discover the source of Williams' post-LAVH complications, Dr. Benge deviated from the standard of care and proximately caused Williams' injuries.
Williams offered evidence that Dr. Benge failed to disclose Dr. Giacobbe's experience level and degree of involvement in the surgery. Williams argued throughout the trial that Dr. Benge's nondisclosure was deceitful and betrayed her trust in him. Dr. Patsner further testified that the lack of disclosure violated the standard of care and was negligent. But Williams has never claimed that the nondisclosure precluded her informed consent or otherwise provides a basis for liability. The jury was asked a single question on liability: Did Dr. Benge's negligence proximately cause Williams' injuries? Dr. Benge objected to the question because it "allow[ed] the jury to base its finding on a violation of informed consent" that Williams did not claim. Dr. Benge requested that the jury be "instructed that in deciding whether [Dr. Benge] was negligent, you cannot consider what [Dr. Benge] told, or did not tell, [Williams] about [Dr. Giacobbe's] being involved with the surgery." The trial court overruled Dr. Benge's objection and refused to give the jury the requested instruction.
The trial court rendered judgment on the verdict for Williams for almost $2 million. On appeal, Dr. Benge argued that Dr. Patsner was not qualified under the Texas Medical Liability Act ("TMLA" or the "Act")[5] to testify as an expert, leaving Williams with no evidence that Dr. Benge violated the standard of care, and thus requiring rendition of judgment in his favor. Dr. Benge also argued that the jury was allowed to find Dr. Benge negligent for failing to disclose Dr. Giacobbe's experience and involvement in the surgery, a basis for liability Williams had disclaimed, thus requiring a new trial. A deeply divided court of appeals agreed only with the second argument and reversed and remanded the case for a new trial.[6] We granted Williams' and Dr. Benge's petitions for review.[7]
*471 II
The TMLA requires that an expert testifying on whether a physician departed from accepted standards of medical care must have been "practicing medicine" either when the claim arose or when the testimony was given.[8] Under the Act, practicing medicine "includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."[9] "Physician" in this context and for our purposes means a person licensed to practice medicine in the United States.[10] Dr. Patsner was not practicing medicine when Williams' claim arose; he was teaching law in Houston. Dr. Benge argues that he also was not practicing medicine at the time he testified.
Dr. Patsner is an obstetrician and gynecologist, board-certified in 1986, and licensed to practice in California, New Jersey, and New York. He graduated from Baylor College of Medicine and completed his residency at Harvard Medical School. He estimates that he has performed or first-assisted some 450 LAVH procedures and more than 6,000 abdominal or vaginal hysterectomies. When a neck injury resulting from a motor-vehicle accident prevented him from continuing to perform surgery, Dr. Patsner went to law school, graduating in 2003. In 2007, he began teaching law at the University of Houston Law Center and medicine at Baylor College of Medicine. He also taught medicine at Ben Taub Hospital and the Harris County Hospital, where he served as the Assistant Director of Gynecology Oncology Service. In 2011, Dr. Patsner moved to South Korea to teach both law and medicine at Yonsei University. He remained involved in medical research at Baylor and Ben Taub. While in Texas to testify in this case, he collaborated with a Baylor professor of gynecologic oncology on their joint research projects. Three days after testifying, he was scheduled to go to Honduras to join physicians, including a medical oncologist with MD Anderson Cancer Center in Houston, to perform and teach the LAVH procedure.
Dr. Patsner testified that he was not practicing medicine in South Korea, but the context makes clear that by those words he meant only that he was not seeing patients there because he was not licensed to practice in the country.[11] In giving that testimony, Dr. Patsner was not asked whether he was "practicing medicine" as defined by the TMLA. Even if he *472 had been asked that question, the application of the statutory definition is a legal issue for the court, not a witness. An expert under the TMLA need not be engaged in patient care.[12]
Focusing on the TMLA test, Dr. Benge argues that while there is evidence that Yonsei Medical School was affiliated with an accredited training hospital, there is no evidence that the school itself was accredited, and thus no evidence that, under the statute, he was "training residents or students at an accredited school of medicine".[13] Dr. Benge also argues that there is no evidence that the physicians Dr. Patsner consulted with were licensed to practice in the United States or were providing patient care, and thus no evidence that he was "serving as a consulting physician to other physicians who provide direct patient care".[14]
But we have cautioned that while "there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question",[15] the TMLA's test for "expert qualifications should not be too narrowly drawn".[16] Indeed, the test cannot be rigidly applied because it is expressly nonexclusive. Absent evidence to the contrary, the trial court could fairly infer that Dr. Patsner's teaching position in South Korea was with accredited institutions, and that the physicians with whom he was consulting on LAVH surgery, including an MD Anderson oncologist, were licensed in the United States and providing patient care. The trial court was well within its discretion in allowing Dr. Patsner, with his extensive experience in practicing and teaching obstetrics and gynecology, to testify as an expert under the TMLA.
III
We turn now to Dr. Benge's argument that the trial court's refusal to instruct the jury not to consider "what [he] told, or did not tell, [Williams] about [Dr. Giacobbe's] being involved with the surgery" was error requiring a new trial.
A
At trial and on appeal, Williams has steadfastly disclaimed any assertion that Dr. Benge is liable for failing to obtain her informed consent to surgery. She acknowledges that she consented in writing to the possible involvement of a resident in her LAVH procedure. She does not contend that she misunderstood the consent forms she signed. She does contend that Dr. Benge is nonetheless liable for his negligence in allowing Dr. Giacobbe in particular-with no experience in performing the surgery-to assist in the LAVH procedure, in assigning her the surgical tasks he did, and in supervising her work. Her disclaimer of an informed-consent claim does not, of course, foreclose that negligence claim.
But Williams also contends that Dr. Benge not only allowed Dr. Giacobbe to assist in surgery, he failed to disclose that Dr. Giacobbe had never performed an LAVH procedure and that she would be significantly involved in the surgery. Indeed, Williams' nondisclosure contention *473 was front and center beginning to end. The first words out of Williams' counsel's mouth in his opening statement to the jury were that a surgeon "cannot pass off part of [a] surgery to a resident without the express permission of the patient." "[T]he reasons ... we're bringing suit", he told the jury, were: "First, [Dr. Benge] betrayed [Williams]. He told her he was going to do the surgery. She trusted him to do the surgery. He did not, and he will admit to you he did not live up to his end of the deal." Dr. Benge betrayed Williams, counsel continued, by having "a secret surgeon, a first-time resident do a significant part of this procedure." "The first thing you must do" as a surgeon being assisted by a resident, counsel said, "is you must inform the patient." Dr. Benge "didn't tell [Williams] that [r]esident Lauren Giacobbe was going to do the procedure. He didn't tell her that the resident had never done the procedure before." "We're suing", Williams' counsel repeated, because Dr. Benge brought in "a surgeon who had no permission, who had no consent to put her hands on [Williams]." That, he reiterated, was the "[f]irst reason". The other reasons were Dr. Benge's conduct of the surgery and his post-surgical failure to promptly diagnose and treat Williams' bowel perforation.
Williams' counsel repeatedly asked Dr. Benge on the stand whether he had told Williams that Dr. Giacobbe would be involved in the surgery or her level of experience. "[Y]ou didn't tell Lauren Williams that there was going to be a first-time resident performing surgery ... with you, correct?" Dr. Benge answered that he told Williams only that he would have an assistant who might be a resident. Dr. Benge testified that Williams had met Dr. Giacobbe just before surgery. But "[i]f someone were to ... conclude that Lauren Williams neither had the knowledge or the consent [that a substitute surgeon was to operate], someone was deceitful, correct?" Dr. Benge agreed. "Are you going to tell me that you gave complete disclosure of who was going to be performing the operation?" counsel again asked. "I told her that I would be doing the surgery with an assistant", Dr. Benge replied. "Was there a secret surgeon used on Ms. Williams?" Dr. Benge was asked. "No", he replied. In all, Dr. Benge was asked about his nondisclosure of Dr. Giacobbe's involvement and Williams' lack of consent some 20 times. Williams' testimony likewise centered on Dr. Benge's failure to disclose, and her failure to consent to, Dr. Giacobbe's involvement.
In summation, Williams' counsel again told the jury that the "[n]umber one" reason Williams had sued was because Dr. Benge had not disclosed to her Dr. Giacobbe's lack of experience and involvement in the surgery.
Williams argues that her evidence of Dr. Benge's nondisclosure was not a claim of lack of informed consent for which he could be liable. As already noted, she disclaims any such basis for liability.[17] But Williams' argument is contradicted by the record. Dr. Patsner, Williams' expert, testified repeatedly that Dr. Benge's nondisclosure violated the standard of care-that it was negligent. Williams' counsel asked: "Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident doing this her-first-time procedure-was going to *474 be performing a part of the surgery?" "Well, yes", Dr. Patsner answered. "[T]he standard of care is to get permission from the patient for everybody who's going to be operating on them. You can't have ghost surgeons." "Period?" he was asked. "End of story?" "Period", he replied. "No question?" "No question.... I mean, ... that's just the rule." Again, Williams' counsel asked Dr. Patsner: "Do you believe that Dr. Benge fell below the standard of care when he allowed someone without ... express consent to operate on Lauren Williams?" Again, Dr. Patsner answered, "Yes." A third time, Dr. Patsner was asked: "The area of betrayal ... the failure of Dr. Benge to explain who was doing the surgery on Ms. Williams-was that below the standard of care?" "Yes", he answered. "Was that negligent?" counsel asked. "Yes", he said.
Williams argues that her claim of nondisclosure, which she clearly makes, is not the same as a claim of lack of informed consent, which she disclaims. We fail to see the difference. Williams concedes that in her written consent, she acknowledged the possible involvement of a resident in surgery. But she contends that she was not told enough about that involvement: who the resident would be, what the resident would do, and the resident's experience. Though she acknowledges informed consent to the risks of surgery and the involvement of a resident, she has repeatedly denied informed consent to the involvement of Dr. Giacobbe, calling it a betrayal and deceitful. Her nondisclosure claim cannot be viewed as anything other than a claim of lack of informed consent.
Williams argues that evidence of Dr. Benge's nondisclosure was offered only to show that he told Williams less than he said he did-that he was not telling the truth-and therefore impugn his credibility regarding the surgery and follow-up. But Williams has not identified any fact with respect to which Dr. Benge's credibility was important. Williams contends that Dr. Benge was not truthful when he ascribed the bowel perforation to the Bovie, but that was a matter of opinion, not fact. Moreover, the repeated questions and argument were not merely about what Dr. Benge did or did not tell Williams; they were about whether he should have told her more-about whether he had a duty to do so under the standard of care. Williams' argument that the issue was Dr. Benge's credibility is flatly refuted by the testimony she repeatedly elicited from Dr. Patsner, not that Dr. Benge was unworthy of belief, but that he violated the standard of care and was negligent. The issues of whether Dr. Benge was negligent in involving Dr. Giacobbe and supervising her in the surgery, and whether Dr. Benge was negligent in failing to disclose to Williams what was required to obtain her informed consent, are completely different. Williams' evidence and argument at trial confused them.
B
Based on Dr. Patsner's testimony, the jury could have found that Dr. Benge was negligent in failing to disclose Dr. Giacobbe's involvement in the surgery and her lack of experience. But Williams does not assert that claim. Therefore, Dr. Benge argues, the jury should have been instructed not to consider the lack of disclosure in determining negligence, and the trial court erred in refusing the requested instruction. He contends that the error must be presumed harmful under our decision in Crown Life Insurance Co. v. Casteel[18] and its progeny.
*475 In Casteel , the jury was asked to find whether the defendant was liable for engaging in any of 13 practices listed in a single question.[19] For 4 of the listed practices, the plaintiff could not recover because he was not a consumer.[20] Hence, the question included both valid and invalid liability theories. The court of appeals held that the mixing of valid and invalid theories was error but that the error was harmless because there was some evidence to support a finding of liability under at least one of the valid theories.[21] We disagreed, holding that "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory."[22]
The jury question in the present case, unlike the one in Casteel , did not include multiple theories, some valid and some invalid. It inquired about a single theory: negligence. But we have twice held that when the question allows a finding of liability based on evidence that cannot support recovery, the same presumption-of-harm rule must be applied.
In Columbia Rio Grande Healthcare, L.P. v. Hawley , the liability question to the jury was stated the same as in the present case: Was the hospital's negligence a proximate cause of the plaintiff's injuries?[23] The jury was instructed that the hospital could "act only through its employees, agents, nurses, and servants."[24] The charge did not define "agent".[25] There was evidence in the case of a physician's negligence, and the hospital requested that the jury be instructed that the physician was not its agent.[26] The trial court refused.[27] We held that while the case presented "a different jury charge problem" than Casteel did, the trial court's error "effectively preclude[d] reviewing courts from determining whether the jury found liability on an invalid basis, preclude[d] determination of whether the error probably caused the rendition of an improper judgment, and [was] harmful because it prevent[ed] proper presentation of the case on appeal."[28]
Likewise, in Texas Commission on Human Rights v. Morrison , the liability question to the jury asked about a single theory: employer retaliation.[29] The plaintiff complained of several adverse actions taken by her employer, including the denial of a promotion, but liability could not be based on the denied promotion because the plaintiff had not included that particular action in her EEOC complaint.[30] Over the employer's objection, the trial court submitted a single question asking whether the employer took "adverse personnel actions" against the plaintiff.[31] The plaintiff *476 argued on appeal, as Williams does here, that there was no charge error because "no invalid theory was directly submitted to the jury".[32] We rejected that argument, and even though the employer had not requested a limiting instruction, held that the error in overruling the objection was presumed harmful.[33]
Here, as in Hawley and Morrison , while the jury was asked about a single liability theory, the plaintiff advanced multiple claims in the evidence. Dr. Benge was negligent, Williams claimed, in allowing Dr. Giacobbe to assist, failing to disclose her involvement, improperly supervising her, and failing to promptly detect the bowel perforation. Dr. Patsner testified that Dr. Benge's nondisclosure fell below the standard of care. The jury could have based its finding of negligence only on that nondisclosure or any 1 or more of Williams' other claims. Williams has disclaimed recovery for Dr. Benge's nondisclosure. Dr. Benge requested that the jury be instructed, correctly, that it could not consider the nondisclosure in deciding whether he was negligent. Because the trial court refused the instruction, we cannot determine whether it was the basis for the jury's finding. As in Hawley and Morrison , as well as Casteel , because an appellate court cannot determine whether the jury found liability on an improper basis, we must presume that the error in denying Dr. Benge's limiting instruction was harmful. The rule "both encourage[s] and require[s] parties not to submit issues that have no basis in law and fact in such a way that the error cannot be corrected without retrial."[34]
C
Williams argues that Dr. Benge's complaint is not about the charge but about the admission of evidence, to which he did not sufficiently object. At a pretrial hearing on the parties' motions in limine, Dr. Benge asked the court to exclude evidence on what he told or did not tell Williams about Dr. Giacobbe's involvement in the surgery. Dr. Benge argued that the evidence was irrelevant because Williams had not pleaded lack of informed consent. The trial court denied Dr. Benge's motion but granted him a running objection to questions about nondisclosure. Dr. Benge reasserted the objection early in the trial, and the trial court again allowed a running objection. But Dr. Benge did not object to each of the many questions about nondisclosure.
We need not decide whether the trial court erred by admitting evidence of Dr. Benge's failure to disclose Dr. Giacobbe's involvement to Williams, or whether Dr. Benge preserved his objection. Whether Dr. Benge has an evidentiary complaint or not, the complaint he makes is that the charge allowed the jury to consider what he did or did not tell Williams about Dr. Giacobbe's involvement in the surgery in deciding negligence, even though Williams does not seek recovery on that basis. He objected to the charge and requested a limiting instruction.
In Morrison , we held that an objection to the charge even without a requested question or instruction preserved the complaint that the evidence would allow the jury to find liability in answer to a single broad-form question, on a theory on which the plaintiff could not recover.[35] Dr. *477 Benge's objection and requested instruction went as far as that case requires.
The court of appeals was correct in concluding that the charge error requires a new trial.
* * * * *
Accordingly, the judgment of the court of appeals is
Affirmed.

472 S.W.3d 684, 711-712 (Tex. App.-Houston [1st Dist.] 2014) (2-1 decision), en banc recons. denied , 472 S.W.2d 725 (Tex. App.-Houston [1st Dist.] 2015). The plaintiff's first surgery was on August 26, 2008. She sued on August 23, 2010, just before limitations would have run. The jury rendered a verdict on January 20, 2012, and the trial court signed its judgment on March 23, 2012. Briefing in the court of appeals was not completed until December 13, 2013. The court heard oral argument January 21, 2014, and a divided panel issued its opinions November 18, 2014. The parties' motions for rehearing en banc were denied on September 22, 2015. The panel majority issued a supplemental opinion, to which there were 3 dissents. Briefing in this Court was completed February 20, 2017. The Court granted the petitions for review on March 10, 2017, and set argument for September 12, 2017. At the parties' joint request, argument was postponed due to Hurricane Harvey until January 11, 2018.

Id. at 698.

See City of Keller v. Wilson , 168 S.W.3d 802, 807 (Tex. 2005) ("[A]ppellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.").

"A speculum ... is a medical tool for investigating body orifices, with a form dependent on the orifice for which it is designed." Speculum (medical) , Wikipedia , https://en.wikipedia.org/wiki/Speculum_(medical) (last visited May 23, 2018). A weighted speculum is
[a] specialized form of vaginal speculum... consist[ing] of a broad half tube which is bent at about a 90 degree angle, with the channel of the tube on the exterior side of the angle. One end of the tube has a roughly spherical metal weight surrounding the channel of the speculum. A weighted speculum is placed in the vagina during vaginal surgery with the patient in the lithotomy position. The weight holds the speculum in place and frees the surgeon's hands for other tasks.
Id.

Tex. Civ. Prac. & Rem. Code ch. 74.

472 S.W.3d at 689.

60 Tex. Sup. Ct. J. 564 (Mar. 13, 2017).

The statute provides:
(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.
Tex. Civ. Prac. & Rem. Code § 74.401(a).

Id. § 74.401(b).

See id. § 74.401(g)(1).

Dr. Patsner testified as follows:
Q You were not practicing medicine when you were working as a law professor in South Korea, were you?
A I'm not practicing medicine in Korea. I'm not licensed in Korea either.
Q You've not seen any patients in Korea, correct?
A I don't examine patients. No.

See Tex. Civ. Prac. & Rem. Code § 74.401(b) (defining "practicing medicine" to "include[ ] ... training residents or students" and "serving as a consulting physician to other physicians").

Id.

Id.

Broders v. Heise , 924 S.W.2d 148, 152 (Tex. 1996).

Larson v. Downing , 197 S.W.3d 303, 305 (Tex. 2006) (per curiam).

The court of appeals held that "Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon's anticipated level of participation or experience." 472 S.W.3d 684, 709 (Tex. App.-Houston [1st Dist.] 2014). Because Williams does not claim to the contrary, we express no view on the court's holding.

22 S.W.3d 378 (Tex. 2000).

Id. at 387.

Id.case-ids="11191006" index="15" url="https://cite.case.law/sw3d/22/378/"> at 388.

Id.

Id. (citing Tex. R. App. P. 44.1(a), 61.1(b) (both stating that an error that "probably prevented" the appellant or petitioner "from properly presenting the case to" the appellate court is grounds for reversal) ).

284 S.W.3d 851, 863 (Tex. 2009).

Id.

Id.

Id.

Id. at 862-863.

Id. at 865.

381 S.W.3d 533, 535 (Tex. 2012) (per curiam).

Id. at 535, 537.

Id. at 536.

Id.case-ids="7126590" index="27" url="https://cite.case.law/sw3d/381/533/#p535"> at 537.

Id.case-ids="7126590" index="28" url="https://cite.case.law/sw3d/381/533/#p535"> at 536-538.

Romero v. KPH Consolidation, Inc. , 166 S.W.3d 212, 230 (Tex. 2005).

381 S.W.3d at 536.