**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-20-00108-CV**

**CHRISTUS HEALTH SOUTHEAST TEXAS D/B/A CHRISTUS HOSPITAL – ST. ELIZABETH, Appellant**

**V.**

**MYRANDA CARNAHAN AND ALEX YATES, INDIVIDUALLY, AND AS NEXT FRIEND OF M.Y., Appellees**

**On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. E-204,242**

**MEMORANDUM OPINION**

We decide in this interlocutory appeal whether the trial court abused its discretion by denying Christus Health Southeast d/b/a Christus Hospital – St. Elizabeth's ("Christus") motion to dismiss the health care liability claims of Myranda Carnahan and Alex Yates ("the Claimants"). In two issues encompassing various sub-issues, Christus contends that the Claimants' expert report and expert's accompanying CV fail to meet the Texas Medical Liability Act's (hereinafter "the

Act") requirements. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l) (requiring a court to grant a motion challenging the adequacy of an expert's report if it does not constitute an objective good faith attempt to comply with the Act's definition of an expert report). Specifically, Christus challenges the expert's qualifications and the sufficiency of the expert's opinions. The hospital argues that the expert's report is so deficient it constitutes "no report at all[.]" For the following reasons, we overrule Christus's issues and affirm the trial court's order denying the motion to dismiss.

## I. Background[1]

Carnahan and Yates sued the hospital, asserting a vicarious liability theory based on the negligent care and treatment by its nurses during Carnahan's hospitalizations while pregnant.[2] Within 120 days of the hospital filing its answer, the Claimants served the hospital with James Wheeler, MD's expert report and accompanying CV as required by the Act. *See id.* § 74.351(a).

---

[1] The expert report at issue in this appeal provides the background facts. The medical records are not part of the appellate record, and we rely on the report's factual statements for the limited purpose of this appeal. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52–53 (Tex. 2002).

[2] In their first amended petition, the Claimants also named Jurswin Pieternelle, MD, as a defendant; however, the attending doctor is not a party to this appeal.

## II. Contents of Curriculum Vitae and Expert Report

### A. Qualifications

Dr. Wheeler's CV notes that he has been a board-certified obstetrician[3] and gynecologist[4] since 1989, with his most recent recertification occurring in 2019. His medical employment history from 1995 to the present lists his private practice as a "Reproductive endocrinologist,[5] Obstetrician/Gynecologist" and parenthetically notes "Occasional Ob/Gyn *Locum tenens* placement[.]"[6] His current hospital appointments indicate that since 2006, he has served as a courtesy staff member with admitting and consulting privileges at Woman's Hospital of Texas, having been renewed most recently in 2018. Prior to that, between 1988 and 1994, he had an

---

[3] An obstetrician is a physician specializing in obstetrics. *See* https://merriam-webster.com/dictionary/obstetrician last accessed 11/9/2020. "Obstetrics" is defined as "a branch of medical science that deals with pregnancy, childbirth, and the postpartum period[.]" https://merriam-webster.com/dictionary/obstetrics (last accessed 11/19/2020).

[4] A gynecologist is a physician specializing in gynecology. *See* https://merriam-webster.com/dictionary/gynecologist (last accessed 11/9/2020). "Gynecology" is defined as a "branch of medicine that deals with the diseases and routine physical care of the reproductive system of women[.]"https://merriam-webster.com/dictionary/gynecology (last accessed 11/19/2020).

[5] The American College of Obstetricians and Gynecologists' website explains that some ob-gyns have extra training in a focused area of women's health care, and specifically notes that "reproductive endocrinology" is "focused on the hormones of the reproductive system and helping women who have problems getting pregnant[.]" https://acog.org/womens-health/about-acog (last visited 11/19/2020).

[6] "*Locum tenens*" is defined as "one filling an office for a time or temporarily taking the place of another[.]" https://merriam-webster.com/dictionary/locum%20tenens (last accessed 11/19/2020).

3

academic practice at Baylor College of Medicine, where he worked from 1988 until 1996 as a reproductive endocrinologist and obstetrician/gynecologist and as a clinical assistant professor and assistant professor in the Departments of Obstetrics/Gynecology and Community Medicine.

Dr. Wheeler's CV also reveals he is a licensed attorney. From 2016 through 2018, he served as a professor of medicine, law, and nursing for Brighton College/The Paralegal Institute, where he taught courses such as "Legal Research – Legal Nurse Consultant Diploma Program[.]" Dr. Wheeler's expert report states that he has earned a Legal Nurse Consulting diploma, and from 2016 to 2018, he "taught undergraduates, nurses, medical students and doctors in various courses pertaining to consulting in medical and nursing issues within legal cases." Dr. Wheeler asserts the following in his report,

> I have worked side-by-side with nurses at various educational levels, nurse-midwi[v]es, and physician assistants. I have taught these professionals a variety of subjects in Ob/Gyn, including topics in Obstetrics. I have worked as a nurse, moonlighting in medical school, in Surgical, Medical and Cardiac ICUs. I have edited and helped with the publication of documents for the Nurses Association of the American College of Obstetricians and Gynecologists ("NAACOG"). I have reviewed hospital policies pertaining to nursing care, including policies and procedures within Labor & Delivery units.

**B. Review of Carnahan's and M.Y.'s Medical Records**

Dr. Wheeler outlines the medical records reviewed in this case, including, among others, Carnahan's records from the hospital. Of significance, Dr. Wheeler

4

notes Carnahan's "medical comorbidities." He mentions Carnahan's BMI of 41.3 kg/m$^2$, classifying her obesity as "extreme," and she suffered from hypothyroidism, treated by levothyroxine. She also had a recent "positive history of E. coli UTI."

Dr. Wheeler's report explains that on May 30, 2017, Carnahan presented to Christus at 26 3/7 weeks' gestation with complaints of "pelvic pressure" and lower abdominal pain that began the previous day, which she described as "crampy." A vaginal exam was ordered "per unit standard" and noted by a nurse, but the exam was "deferred." Dr. Wheeler explains in the report that the notation "per unit standard" means the "exam [w]as part of the routine evaluation of a woman in possible preterm labor; other units have this as a standing order from each Obstetrician." Dr. Wheeler mentions that fetal heart rate monitoring was ordered as were urinalysis, urine culture, and vaginal nitrazine pH test to assess rupture of amniotic fluid. The urinalysis and urine culture suggested a bacterial infection but was considered contaminated. Dr. Wheeler notes that a Complete Blood Count ("CBC") was also ordered, but Carnahan was discharged on May 30, 2017, before the results were received.[7] Carnahan was discharged on the evening of May 30, 2017, on antibiotics with instructions about contractions.

---

[7] More specifically, the report notes the results were not returned to the chart until June 1, 2017.

On June 1, 2017, Carnahan returned to Christus where at 04:58 a nurse responded to an emergency call light in Carnahan's room. The nurse then observed Carnahan sitting on the toilet with the baby hanging out of her vagina. Nurses retrieved the baby, wrapped her in towels, and a nurse stimulated the baby. Nurses then "rushed [the infant] to the NICU,"[8] arriving at 05:05.

In his expert report, Dr. Wheeler mentions a history and physical plus delivery note that Carnahan presented

> complaining of pelvic pressure and Urinary Tract Infection ("UTI") symptoms continuing. Was seen in triage 5/30/17 with complaints of UTI. The physical exam noted "placenta and cord at the introitus with clamp and foul smell". Under assessment, "No contractions reported. Admitted for intravenous antibiotics – Rocephin 1 g at 01:20 . . . patient resting and when got up to use bathroom, sat down to seat, felt gush of fluids and baby coming out. Called RN. RN found patient on toilet with baby between legs, face-up above water – grasped baby and called for help. Cord clamped and cut infant rushed to NICU. 2#, 14 ½ inches long – suspect chorioamnionitis."

Dr. Wheeler noted that "[p]lacental pathology demonstrated severe acute chorioamnionitis and moderate acute funisitis of the umbilical cord" and bacterial cultures were positive for "two anaerobic species . . . known to be associated with chorioamnionitis, and preterm labor."

---

[8] NICU is the acronym for neonatal intensive care unit. *See* https://merriam-webster.com/dictionary/NICU (last accessed 11/19/2020).

Dr. Wheeler writes that M.Y. had "Apgar scores of 2, 2 and 4 at 1, 5, and 10 minutes of life."[9] Dr. Wheeler included in his review the records from Texas Children's Hospital for minor M.Y. (DOB 06/01/2017). Dr. Wheeler explains that recorded problems associated with M.Y.'s prematurity "included intraventricular hemorrhage, retinopathy of prematurity, bronchopulmonary dysplasia, feeding difficulties, apnea, anemia, and diaper dermatitis." He further notes Early Childhood Intervention documents M.Y.'s ongoing developmental delay.

## C. Opinions on Standards of Care and Causation

Citing multiple sources, Dr. Wheeler's report explains that "[p]reterm birth is the leading cause of neonatal mortality in the U.S.," and the "[d]iagnosis of preterm labor is aided by detecting maternal risk factors." The report also notes that risk factors for preterm birth and labor "have been published for decades in Ob/Gyn textbooks and include complications like . . . infection *including urinary tract infection ("UTI")*, and . . . obesity." (Emphasis original.) Dr. Wheeler states, "Ob nurses have been taught[] that [e]very attempt should be made to detect preterm labor early in its evolution." (Internal quotations omitted.)

---

[9] Apgar refers to "an index used to evaluate the condition of a newborn infant based on a rating of 0, 1, or 2 for each of the five characteristics of color, heart rate, response to stimulation of the sole of the foot, muscle tone, and respiration with 10 being a perfect score." https://merriam-webster.com/dictionary/Apgar%20score (last accessed 11/19/2020).

Dr. Wheeler outlines the applicable standards of care for the Christus nurses as "those standards of reasonably well-trained and well-experienced labor and delivery nurses caring for patients the same as, or similar to, Ms. Carnahan[,]" which include: (1) the proper assessment of risk factors of preterm labor; (2) recognition of subtle symptoms and signs of preterm labor regardless of risk factor profile; (3) assessing the cervix, "as the very definition of preterm labor requires this assessment, via visual inspection, digital examination, or effecting the performance of ultrasonography[;]" and (4) not discharging the patient incompletely assessed and potentially treated for preterm labor, in order to avoid tragic preterm birth in some precarious setting. As to the nurses' specific departures from the standards of care, Dr. Wheeler opines that they failed to properly assess Carnahan's preterm labor risk factors, failed to recognize her symptoms and signs indicative of preterm labor, failed to assess the cervix in possible preterm labor, and discharged a patient in possible preterm labor with a CBC test pending.

With respect to damages and proximate cause, Dr. Wheeler opines that if the nurses had satisfied their applicable standards of care, Carnahan would have been found to be in preterm labor, which would have led to hospital admission followed by bedrest, hydration, IV antibiotics, fetal and uterine monitoring, tocolysis[10] with

---

[10] "Tocolysis" is defined as the "inhibition of uterine contractions." https://merriam-webster.com/medical/tocolysis (last accessed 11/19/2020).

magnesium sulfate, beta-mimetics or non-steroidal anti-inflammatories. He further reasons that those therapies can prolong gestation and provide time for the administration of corticosteroids. Dr. Wheeler explains that "the most beneficial intervention for patients in true preterm labor is the administration of corticosteroids[,]" which "significantly reduce[] the incidence and severity of neonatal respiratory distress syndrome . . . intraventricular hemorrhage . . . necrotizing enterocolitis . . . and neonatal mortality." Ultimately, Dr. Wheeler concludes that "[i]n reasonable medical probability, if Ms. Carnahan had been treated within the standards of care outlined above, she could have carried M.Y. sufficient time such that corticosteroid administration would have reduced the significant medical morbidity with which she suffers to this day." Moreover, Dr. Wheeler's report links the breaches in the standard of care that he found to M.Y's injuries, explaining that "[b]ut for the negligent care Ms. Carnahan received form Christus St. Elizabeth, it is medically probable [M.Y.'s] damages would be prevented, or significantly reduced."

### III. Standard of Review

In health care liability cases, we review a trial court's ruling on a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *See Abshire v. Christus Health Southeast Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Am.*

9

*Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A trial court's ruling does not constitute an abuse of discretion simply because the appellate court would have ruled differently under the circumstances. *See id.; Hendryx v. Duarte*, No. 09-18-00070-CV, 2019 WL 1065052, at *4 (Tex. App.—Beaumont Mar. 7, 2019, no pet.) (mem. op.). In reviewing a report's sufficiency under this standard, "we consider only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 878). In determining whether the report contains the requisite information, we view the entirety of the report rather than isolating specific portions or sections. *See Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018); *Van Ness*, 461 S.W.3d at 144.

Likewise, we use an abuse of discretion standard when reviewing a trial court's decision that an expert in a health care liability case is qualified to express opinions about whether the patient's medical care violated the standards applicable to the provider. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996) ("The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse."); *Hendryx*, 2019 WL 1065052, at *5 (applying abuse of discretion standard for an expert's qualifications

to express opinions about whether the medical care a patient received violated the applicable standards). We defer to the trial court on close calls concerning an expert's qualifications. *See Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006). An expert's knowledge cannot be inferred, and the basis for his qualifications must be evident in the report or CV. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) (orig. proceeding).

## IV. Law and Statutory Framework

The Act requires a claimant to serve an expert report on each party against whom a health care liability claim is asserted within 120 days of a defendant filing an answer. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The statute defines "expert report" as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

The report need not marshal all the plaintiff's proof but must set forth the expert's opinions on the standard of care, breach, and causation. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). If the defendant challenges the report, the court must decide whether it constituted "a good-faith effort to comply" with the statute. *Wright*, 79 S.W.3d at 52. A "good-

11

faith effort" (1) informs the defendants of the specific conduct the plaintiffs call into question and (2) provides a basis for the trial court to conclude the claims have merit. *Baty*, 543 S.W.3d at 693–94.

Texas Civil Practice and Remedies Code section 74.351(r)(5) provides the following experts are qualified:

> (B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;
>
> (C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence . . . .

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B)–(C). Section 74.402 provides in pertinent part:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
>> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>>
>> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

12

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(b)–(c). The statute further explains that "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id.* § 74.402 (a)(1)–(2). Finally, with respect to an expert qualified to opine on causation, the statute provides,

a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

*Id.* § 74.403(a).

The expert offering the opinions in the report must be qualified to render those opinions.

> To be qualified to opine that an institutional health-care provider breached the applicable standard of care, a person must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care."

*Mem'l Hermann Health Sys. v. Heinzen*, 584 S.W.3d 902, 911 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann § 74.402(b)(2), (b)(3)). Further,

> [w]hile it is true that for certain medical-negligence claims against non-physicians, a person is qualified to render an expert report only if the person is or was engaged in a field of health-care practice "that involves the same type of care or treatment as that delivered by the defendant health care provider . . . at the time the testimony is given or . . . at the time the claim arose," that requirement applies only "if the defendant health care provider is an individual."

*Id.* (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)). Because the hospital is not an individual, this provision does not apply to a doctor's report regarding the care the hospital provided through its nursing staff. *See id.* at 911–12 (citing *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 644–46 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (determining subsection inapplicable to an expert report addressing a claim against a hospital for its nursing staff's conduct)). A person may be qualified to render an expert opinion regarding the applicable standard of

14

care for hospital nursing staff based on previously acquired experience. *See, e.g., id.* at 912; *see also Zamarripa*, 526 S.W.3d at 461 n.37 (noting that the trial court was within its discretion to determine the nurse was qualified to offer opinions on applicable standards of care for labor and delivery nurses based on prior experience, even though she currently worked as a hematology-oncology nurse). "Section 74.351(r)(5)(B) does not require an expert to have the same specialty as the health care provider she evaluates." *Zamarripa*, 526 S.W.3d at 461 n.37 (citations omitted). However, an expert offering an opinion on causation in a claim under the Act must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence[.]" Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C).

We are "cautioned that while 'there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question,' the TMLA's test for 'expert qualifications should not be too narrowly drawn.'" *Benge v. Williams*, 548 S.W.3d 466, 472 (Tex. 2018) (quoting *Larson*, 197 S.W.3d at 305; *Broders*, 924 S.W.2d at 152).

The Texas Supreme Court has explained that obtaining an expert's opinions early in the litigation is a way to reduce frivolous lawsuits. *See Palacios*, 46 S.W.3d at 877; *see also Baty*, 543 S.W.3d at 692. "[T]he purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits."

15

*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) (citation and internal quotations omitted).

## V. Analysis

With the above statutory framework and standard of review in mind, we turn to the hospital's complaints that Dr. Wheeler is unqualified to render an expert opinion in this case and that his opinions did not constitute a good-faith effort to comply.

### A. Issue Two: Dr. Wheeler's Qualifications and "No Report"

Christus challenges Dr. Wheeler's qualifications, arguing "the issue is not whether Dr. Wheeler was qualified as an obstetrician or gynecologist, but whether his expertise renders him an expert regarding the diagnosis, care, or treatment of the condition involved in this case." Christus asserts that Dr. Wheeler's report constitutes "no report[.]" While we agree that not every licensed physician will be qualified to testify regarding every medical issue, we note that the test for Dr. Wheeler's expert qualifications should not be too narrowly drawn. *See Benge*, 548 S.W.3d at 472 (citations omitted).

The four corners of the report and accompanying CV discuss Dr. Wheeler's extensive obstetrical and gynecological training. Christus disagrees that Dr. Wheeler's report and CV establish his qualifications to opine on the standard of care applicable to the nurses. Specifically, Christus contends that

16

nothing in his CV or report establishes that he has any training or experience that would form the basis for his opinions as to the standard of nursing care for a preterm obstetrical patient in a hospital setting. Nothing indicates he has worked as an obstetrician treating pregnant women, who present to the hospital with abdominal pain in the second trimester of pregnancy and subsequently deliver babies prematurely.

Without offering an opinion regarding whether Christus has tried to construct the expert qualification test too narrowly, we believe the trial court was well within its discretion to conclude, based on the information provided in the report and CV, that Dr. Wheeler's extensive training and experience practicing as an Ob/Gyn, himself working as a nurse, and working with nurses delivering babies as well as teaching them, rendered him qualified to offer opinions even as the appellants have framed the issues. Essentially, Christus complains that Dr. Wheeler's focus as a subspecialist in the field of reproductive endocrinology means he is unqualified in the larger field of obstetrics and that the trial court could not determine he was qualified. We disagree. Reproductive endocrinology is part of the larger umbrella of obstetrics and gynecology. Dr. Wheeler's CV shows that he has continuously been recertified by the American College of Obstetricians and Gynecologists, and in addition to his role as a reproductive endocrinologist, he works as an obstetrician and gynecologist on a *locum tenens* basis.

In his report, Dr. Wheeler describes that he has "edited and helped with the publication of documents for the Nurses Association of the American College of Obstetricians and Gynecologists ("NAACOG") [and] reviewed hospital policies

17

pertaining to nursing care, including policies and procedures within Labor & Delivery units." Further, in his report he explains that he has "worked side-by-side with nurses at various educational levels, nurse-midwi[v]es, and physician assistants . . . and taught these professionals a variety of subjects in Ob/Gyn, including topics in Obstetrics." Dr. Wheeler also wrote in the report that "[t]he depth and breadth of my clinical experiences, in both medicine and nursing, make me a reasonable physician to review the clinical aspects of minor M.Y.'s case."

Christus isolates portions of Dr. Wheeler's report and CV focusing on reproductive endocrinology while ignoring the rest of his training and practice. Yet, we must view the report and CV in their entirety, rather than examining isolated portions. *See Baty*, 543 S.W.3d at 694. Dr. Wheeler's CV establishes that he continues to practice as an Ob/Gyn with occasional *locum tenens* placement. Likewise, he is a Diplomat with the American Board of Obstetrics and Gynecology since 1989 and was recertified as recently as 2019. Dr. Wheeler's CV also reveals that from 2006, he has had consulting privileges at the Woman's Hospital of Texas. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(a)(2) (noting that "practicing health care" includes "serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider").

To the extent the hospital argues that Dr. Wheeler is unqualified, and therefore, his report constitutes "no report," such argument lacks merit. The hospital

18

relies heavily on *Scoresby v. Santillan* in support of this argument. However, the Texas Supreme Court explained that "[a]n inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable." *See* 346 S.W.3d 546, 556 (Tex. 2011). The Court further explained that it had "rejected the argument that a deficient report is no report." *Id.* at 556 (citing *Ogletree v. Matthews*, 262 S.W.3d 316, 320–21 (Tex. 2007)).

Based on the foregoing, we cannot say the trial court acted without reference to guiding rules or principles when it determined that Dr. Wheeler was qualified as an expert to render opinions on the standard of care pertaining to nurses, breaches of those standards of care, and how those failures proximately caused the injuries in this case. Accordingly, we disagree with the hospital's contention that Dr. Wheeler was unqualified, and therefore, his report constituted "no report." The trial court was well within its discretion in determining Dr. Wheeler is qualified, and we overrule the hospital's first issue. We defer to the trial court on close calls concerning an expert's qualifications. *See Larson*, 197 S.W.3d at 304–05 (explaining deference given to trial court on close calls concerning expert's qualifications); *see also Wright*, 79 S.W.3d at 52 (explaining a trial court's ruling does not constitute an abuse of discretion simply because an appellate court would rule differently under the circumstances).

**B. Issue Two: Section 74.351 and Good Faith Effort**

In their second issue, Christus complains that Dr. Wheeler's report was "legally and materially deficient and failed to constitute an objective good faith effort to meet the requirements of section 74.351[(a).]"[11] In conducting our analysis of whether the expert report constitutes a "good-faith effort," we must determine whether it (1) informs Christus of the specific conduct the Claimants call into question and (2) provides a basis for the trial court to conclude the claims have merit. *See Baty*, 543 S.W.3d at 693–94. Dr. Wheeler provides the standard of care applicable to the nurses, he describes the nurses' specific conduct that deviated from those standards, and how those deviations proximately caused the injury in question. Therefore, the trial court again acted within its discretion in determining the report reasonably informs Christus of the specific conduct the Claimants complain of and provides a basis for the trial court to conclude the claims have merit; thus, it constitutes a good-faith effort. *See id.*

Dr. Wheeler outlines the factors that placed Ms. Carnahan at a higher risk of preterm labor. He opines that the standards of care applicable to the hospital's nurses in this case included: (1) the proper assessment of risk factors of preterm labor; (2) recognition of subtle symptoms and signs of preterm labor regardless of risk factor

---

[11] Appellants incorporate two sub-issues with this argument; however, since we have determined that the report and Dr. Wheeler's accompanying CV provide a basis for the trial court to determine he is qualified as an expert, we focus on the hospital's primary issue, which is whether the report constituted a good faith effort to comply with the statute.

profile; (3) assessing the cervix, as the very definition of preterm labor requires this assessment, via visual inspection, digital examination, or effecting performance of ultrasonography; and (4) not discharging the patient incompletely assessed and potentially treated for preterm labor, in order to avoid tragic preterm birth in some precarious setting. Dr. Wheeler opines that the nurses departed from each of the foregoing standards of care by failing to do each of those things.

Dr. Wheeler further explains that if the nurses had satisfied the applicable standards of care, Carnahan would have been found to be in preterm labor, "hospital admission would have followed with bedrest, hydration, intravenous antibiotics, continues [sic] fetal and urine monitoring, and tocolysis with magnesium sulfate, beta-mimetics or non-steroidal anti-inflammatories." Dr. Wheeler states in his report that this would have "prolonged gestation" and "provide time" for "the most beneficial intervention for patients in true preterm labor [which] is the administration of corticosteroids." He further explains that the administration of "antenatal corticosteroids significantly reduced the incidence and severity of neonatal respiratory distress syndrome" and "intraventricular hemorrhage[,]" which were some of the complications M.Y. suffered. In sum, Dr. Wheeler's report specifies the standards of care, the nurses' departures from those standards by failing to assess for specific key indicators which would have led to the timely identification of Ms. Carnahan's preterm labor such that there would have been time to administer

21

appropriate care to prolong gestation and to administer corticosteroids, thus preventing or significantly reducing M.Y.'s damages.

In *Baty v. Futrell*, the Texas Supreme Court determined that the expert's opinions contained in the report satisfied the good-faith effort the statute requires for standard of care, breach, and causation. *See id.* at 697–98. There, the Court explained the expert

> does not opine that [the doctor] was negligent merely because the cataract surgery was unsuccessful or because [the plaintiff] suffered permanent nerve damage or vision loss. Inserting the needle into the optic nerve is not a result, good or bad; it is conduct that allegedly caused a bad result in this case. And it is this specific conduct that [the expert] opines falls below the standard of care.
> . . .
>
> [The expert]'s report is sufficient for the same reason: it states a specific action—sticking the optic nerve with the retrobulbar needle—[the doctor] was supposed to avoid doing when administering the retrobulbar block. Further, the report highlights the known increased risk associated with the procedure following the initial inadequate block attempt, noting an alternative procedure that may be employed in that situation. The report's express reference to an alternative method provides some indication of what [the doctor] should have done differently. Additional detail is simply not required at this stage of the proceedings.

*Id.* at 696–97 (citations omitted). Similarly, Dr. Wheeler explains that "[r]isk factors for preterm birth and labor . . . include complications like heart or lung or renal disease, infection *including urinary tract infection ("UTI")*, and . . . obesity." Dr. Wheeler outlines the symptoms Carnahan presented with and her increased risk of preterm labor, based on certain factors, which included her extreme obesity and her

22

"positive history of E. coli UTI." Dr. Wheeler also explains the various methods the nurses should have employed to assess the cervix, the thinning or "effacing" of which is a critical sign of preterm labor. Here, the options were visual inspection using a colposcope, and digital examination, alone or in conjunction with ultrasonography. The report further indicates the nurses did none of these. Rather, it notes the vaginal exam was ordered "per unit standard" and "deferred." Dr. Wheeler also explains how checking for infection utilizing tests like a CBC, is part of a complete assessment of the patient, and failing to obtain complete results prior to discharging Carnahan likewise departed from the nurses' standard of care resulting in a missed opportunity to identify the severe chorioamnionitis.[12] Despite the

---

[12] In its reply, the hospital is critical of Dr. Wheeler's opinion that the nurses failed to "not discharge" Ms. Carnahan, because Dr. Wheeler did not identify *how* they could have intervened in the discharge and argues that is something the doctor controls and that the standards constituted the practice of medicine. Assuming, without deciding that this is true, Dr. Wheeler cites other failures by the nurses, including failure to assess the cervix which resulted in the missed preterm labor. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (holding expert report summarizing the standard of care, its breach, and causation "even if as to one theory only" entitles the claimant to proceed with suit). The report explains that this critical assessment could have been performed by a vaginal exam, which had been ordered "per unit standard" but the nurses failed to do. *See* Tex. Occ. Code Ann. § 301.002(2)(A), (C), (H) (explaining that nursing includes "observation, *assessment*, intervention, evaluation, rehabilitation, care and counsel . . . of a person who is ill, injured, infirm, or experiencing a change in normal health processes[,]" administration of physician-ordered treatment, and development of a nursing care plan) (emphasis added).

hospital's arguments to the contrary, "[a]dditional detail is simply not required at this stage of the proceedings." *See id.*

In its brief, the hospital focuses on an "analytical gap" argument, complaining of Dr. Wheeler's opinion that "M.Y.'s problems are 'clearly attributable' to her 'markedly preterm delivery'" and faults him for not ruling out other causes for M.Y.'s injuries, like the chorioamnionitis. In *Abshire*, the Texas Supreme Court rejected similar arguments. *See Abshire*, 563 S.W.3d at 225–26 (rejecting notion that an analytical gap existed where report adequately linked expert's conclusions to the facts). The hospital's contentions would have us address the merits of Dr. Wheeler's causation opinions versus alternate causes of M.Y.'s injuries. Courts have been clear that we are not to engage in an analysis of the merits at this preliminary stage. *See id.* at 226 (noting focus is if the expert has explained how the negligent conduct caused the injury but the believability of the explanation should be litigated later in the proceedings); *Hendryx*, 2019 WL 1065052, at *5; *see also Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) (explaining "[n]othing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed").

Dr. Wheeler's report informs the hospital of the specific conduct complained of and provides a basis for the trial court to conclude the claims have merit, constituting a good-faith effort to comply. *See Baty*, 543 S.W.3d at 693–94. We

further determine the expert report is not materially deficient as to standard of care, breach, and causation as it outlines applicable standards of care, how the nurses breached those standards in this particular case by identifying the specific tasks and assessments they should have undertaken, and how those failures prevented the identification of preterm labor signs that would have allowed for appropriate treatment, including but not limited to administration of antenatal corticosteroids, which would have reduced specific co-morbidities M.Y. now faces as a result of her preterm birth. Since the report sufficiently identifies the applicable standard of care and links the nurses' alleged breaches with M.Y.'s injuries, we hold the trial court did not abuse its discretion in denying Christus's motion to dismiss. *See Abshire*, 563 S.W.3d at 227. We overrule the hospital's second issue.

## VI. Conclusion

Because the expert report and accompanying CV listed the expert's qualifications and linked the nurses' breaches of the applicable standards of care to M.Y.'s injuries, it allowed the trial court to conclude the report met the Act's requirements. We overrule the hospital's issues and uphold the trial court's order denying the motion to dismiss.

AFFIRMED.

_____
CHARLES KREGER
Justice

25

Submitted on October 20, 2020
Opinion Delivered December 3, 2020

Before McKeithen, C.J., Kreger, and Horton, JJ.